KATHERINE BABICZ, Defendant in Error, *vs.* THE RIVER-VIEW SHARPSHOOTERS PARK COMPANY, Plaintiff in Error.

*Opinion filed October 26, 1912—Rehearing denied Dec. 4, 1912.*

1. AMUSEMENT PARKS—*when a company's liability is not affected by ownership of land where accident occurs.* Where an amusement park company encloses land with its own under an arrangement with the owner to pay him a certain per cent of gross receipts from concessions placed upon his land, its liability for an accident occurring on such land is the same as though it occurred on its own land, where it had the exclusive control of the land, the right to select the concessionaires, make all rules for using the premises and to terminate the concessions.

2. SAME—*when a company is liable for accident.* An amusement park company which operates no attractions itself but merely charges a general admission to the park must nevertheless exercise ordinary care to see that the attractions conducted by its concessionaires are reasonably safe, where it receives a percentage of all admission fees collected by the concessionaires, selects the cashier or ticket seller for each concession, handles all receipts, pays itself its percentage for the use of the ground, for

tickets used, electric power supplied and the salaries of the cashiers or ticket sellers, reserves all right to supervise and control the construction of the concessions and all repairs, and the right to eject concessionaires for violation of the rules or requirements of the company.

WRIT OF ERROR to the Branch "B" Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county; the Hon. HOMER ABBOTT, Judge, presiding.

LEON S. ALSCHULER, and CHARLES W. STIEFEL, for plaintiff in error.

N. L. PIOTROWSKI, (EUGENE M. BUMPHREY, and PHILIP R. FRASER, of counsel,) for defendant in error.

Mr. JUSTICE COOKE delivered the opinion of the court:

The Appellate Court for the First District affirmed a judgment of the superior court of Cook county in favor of defendant in error for personal injuries, and the judgment of that court has been brought up for review by writ of *certiorari.*

Katherine Babicz, the defendant in error, was injured in the collapse of a section of seats erected and used by the concessionaires in an attraction maintained in an amusement park in the city of Chicago. The suit was brought against J. E. Miller and Arthur B. McCoid, the concessionaires, and the Riverview Sharpshooters Park Company. Upon the trial in the superior court a verdict was returned for $6000. The court required a *remittitur* of $2000 and judgment was entered for $4000. Upon appeal the Appellate Court required a further *remittitur* of $1000 and entered judgment for $3000. During the progress of the trial in the superior court the action was dismissed as to Miller and McCoid, the judgment recovered being against plaintiff in error alone. At the end of the plaintiff's case,

and again at the conclusion of all the evidence, plaintiff in error offered a peremptory instruction to find it not guilty.

Plaintiff in error contends that the facts disclosed do not establish any liability on its part for the injuries sustained, and bases this contention upon two grounds: First, that the concessionaires, Miller and McCoid, were lessees in exclusive possession of the premises upon which the accident occurred; and second, that that part of the premises upon which the accident occurred was leased by Miller and McCoid from a third party, Herman Lee. No question is raised about the manner in which the accident occurred or that the defendant in error sustained the injuries claimed.

The Riverview Sharpshooters Park Company is a corporation organized for pecuniary profit and operates an amusement park in the city of Chicago. The park, as originally constituted and operated, consisted of a tract of land 1850 feet long east and west and 600 feet wide north and south. Afterward it acquired an additional strip adjoining this tract on the south, which was 600 feet long north and south and 200 feet wide east and west. According to the testimony of its secretary, William M. Johnson, plaintiff in error never operated a concession within the park. It charged a general admission fee of ten cents for each person who entered the park, and it received in addition a percentage of the gross receipts from each of the concessions. Extending north and south through the tract last acquired by plaintiff in error was a street known as the "Bowery," which was located somewhat west of the center of the tract. The ground on each side of this street was leased to various concessionaires for the erection of such attractions as are commonly found in amusement parks. The strip was not wide enough to permit of the erection of attractions on each side of the street known as the Bowery. Herman Lee was the owner of a strip of land adjoining this tract on the west. From the testimony

of the witness Johnson it was disclosed that the plaintiff
in error had an arrangement whereby, as it needed addi-
tional grounds for concessions, it should use the land of
Lee adjoining the Bowery tract upon terms which had been
agreed upon, and pursuant to that arrangement the whole
of the Lee tract was fenced in by plaintiff in error and in-
cluded within the general park enclosure. That arrange-
ment was such, according to Johnson's testimony, that when
a concessionaire desired additional land for the construc-
tion of his attraction he could have it by complying with
terms agreed upon between plaintiff in error and Lee. The
park company paid Lee nothing for the right to enclose his
land or for the right to take any portion of it as it needed
it, the only consideration being that as the land was oc-
cupied and used, Lee was to receive a certain percentage
from the gross receipts of the concessions. McCoid de-
sired to secure a concession from plaintiff in error and to
install an attraction within the park to be known as the
"Florida Zoo." The concession was granted to him and
he afterward associated Miller with him in the enterprise.
It appears from the testimony that the first contract drawn
between Miller and McCoid and plaintiff in error whereby
they were granted the concession was not executed, for the
reason that McCoid did not desire to have his name ap-
pear as one of the concessionaires. The date this contract
was drawn and presented for execution does not appear
from the abstract. On April 26, 1907, an agreement was
executed between Herman Lee and the Florida Zoo Com-
pany, by Miller as manager, whereby sufficient ground of
the Lee property was leased to the Florida Zoo Company
in the rear of the front space allotted to it by the park
company to erect its attraction, and in consideration of the
lease it was provided that the concessionaires, for the sea-
son of 1907, should pay to Lee ten per cent of the daily
gross receipts, and the treasurer of the park company was
authorized to receive and receipt for all moneys payable

under the agreement. On the first day of May, 1907, an agreement was executed by plaintiff in error and the Florida Zoo Company, by Miller as manager, which recited the application for the concession and the fact that plaintiff in error did not have sufficient ground on which to locate the concession but that it would procure the same for the concessionaires from the adjacent owner, and granted to the concessionaires the right to install and maintain their attraction in the park, with a front on the west line of the Bowery, for the season of 1907. The ground occupied by the concessionaires under these two agreements consisted of a tract eighty feet east and west by fifty feet north and south, the east eight feet of the tract being in the park proper and the west seventy-two feet in the Lee tract. Together with other provisions, the agreement between plaintiff in error and the Florida Zoo Company provided that the concession, as against the public, was under the control of the concessionaires alone, and that in case of accident or casualty the risk and liability was that of the concessionaires, and that the concessionaires undertook and agreed to save the park company harmless from any damages from accidents which might arise out of or be occasioned by the maintenance and operation of the concession. The concessionaires also agreed to be governed by eighteen different rules and regulations of the company, which were set out in full in the contract. Among other things, these rules required that all concessions must be so installed and operated as to comply with the municipal regulations of the city of Chicago and the laws of the State of Illinois; that each concessionaire must suitably guard and protect the features of the attraction he operates, so as to insure the safety of the patrons of the park; that the company reserved the right at all times to make any other general rules which might apply to all the concessionaires, and that when such rules should be adopted and notice given, the same should be as binding and effective as if embraced within the contract.

The rules provided for the time of opening and closing the attractions; that the premises should always be kept in a clean and sanitary condition; that no concessionaire should advertise anything but his own attraction on the premises leased to him; reserved to the company the right of free access at all times, on the part of its officers and agents, to the premises leased to concessionaires, for the purpose of enforcing compliance with its rules and regulations and the preservation of order; required the concessionaires and their employees at all times to be clean and neat in appearance and orderly and polite in their speech and conduct, on penalty of being ejected from the park; provided for a weekly accounting by the concessionaires and the plaintiff in error; required the concessionaires to honor all requests for complimentary passes made by the plaintiff in error, and further provided that any violation of the rules should, at the option of plaintiff in error, be ample grounds for the cancellation of the concession and the removal of the concessionaire from the park, together with his property and effects. The contract provided further that in consideration of the concession the concessionaires would pay plaintiff in error ten per cent of the daily gross receipts, and would also pay the reasonable salaries of all needed cashiers, who were to be selected by plaintiff in error; that they should pay for all tickets of admission to the concession, the tickets to be furnished by plaintiff in error, and should pay for the needed electricity for light and power, also to be furnished by plaintiff in error, and provided that the attraction was to be lighted to the satisfaction of the company.

The accident occurred on June 16, 1907, and the seats which collapsed were erected on the west end of the tract occupied by the concessionaires, upon the land belonging to Lee. It is upon this fact, together with the lease from Lee to Miller and McCoid, that plaintiff in error relies to support its second contention. Under the facts as disclosed, if

there is any liability at all, it is not affected by the fact that the particular part of the tract upon which the accident occurred was land owned by Lee. Plaintiff in error occupied virtually the position of lessor as to the whole of this tract. The Lee land was enclosed by it within the park grounds under an arrangement whereby it was to use that tract in the same manner it used its own grounds. It undertook in its contract with Miller and McCoid to secure for them the ground needed from the adjoining owner, and did so secure it. Under its arrangement with Lee the plaintiff in error had as complete control over the Lee tract as it had over its own grounds. It selected the person or persons to whom any grant or grants of the Lee tract should be given, and, to the exclusion of Lee, retained supervision and control over the portion granted. The only interest Lee had under his contract was to receive ten per cent of the gross receipts, and that was computed and collected for him by plaintiff in error. Should any contingency arise whereby the concession could be terminated on account of the fault of the concessionaires, Lee had no power to act but plaintiff in error alone had the right to terminate the grant.

The only question left to be determined is whether Miller and McCoid were in such exclusive possession and control of the concession as to relieve the plaintiff in error from all liability. No access could be had to the attraction known as the Florida Zoo except through the park. The cashier was selected by plaintiff in error and her salary paid out of the receipts of the concession. This cashier sold all the tickets to the attraction and handled all the receipts, turning them over to the auditor of plaintiff in error. The witness Johnson testified that Frank E. Gates was the superintendent of the park and that John F. Fischer was the chief electrician; that it was the duty of Gates constantly to inspect the various concessions or attractions operated in the park, and to report to the company any infraction

of its rules or any dangerous condition which existed in any concession; that Fischer was required, in the performance of his duties, not only to inspect and keep in working order all the electrical appliances, but also to report any infraction of the company's rules which he might observe. The witness then stated that the company required these inspectors to report to it when any concession was found to be in a dangerous condition, so as to avoid injury to the public, and that when the city pointed out anything that was not right, the company gave the concessionaires an order to make the change and compelled them to make it; that the company did this under its general power of supervision, whereby it reserved the control and oversight of the entire tract; that if the inspector had reported that he had found conditions unsafe, he, the witness, would have compelled the concessionaire to make it safe, and that they required the concessionaires to be very careful.

It appears that the attraction operated by Miller and McCoid, when first installed, was of the class known as "walk around" shows, but that two or three days before the accident occurred the character of the attraction was changed by reason of the death of one of the animals exhibited, and the seats which collapsed were erected at that time. Johnson testified that there was no way to get any lumber into the Florida Zoo with which to build seats without carrying it down the Bowery. Gates testified that he inspected each concession every day, and whenever he saw lumber going into the grounds it was his business to see what was done with it, and if any repairs were going on he went to see how they were made, just the same as if the attraction were being originally constructed, and if he did not think they were doing it right he objected and told them to do it otherwise.

As above stated, the concessions in the park were all operated by persons or corporations other than plaintiff in error. The public were invited to the park for the pur-

pose of enjoying the amusements there afforded and were charged a general admission fee. In addition they were charged a fee for admission to each of the concessions, a percentage of which was paid to plaintiff in error. The park company selected the cashier or ticket seller for each concession, handled all the receipts of the concession, paid to itself its percentage of the gross receipts, paid Lee his percentage if the concession was located, in part, on his ground, paid itself for the tickets used and for the electricity supplied, and paid the salary of the cashier, returning the balance on each seventh day to the respective concessionaires. By its rules and its general conduct it reserved more than the mere right of inspection of the premises. It reserved such supervision and control as placed it in the joint possession and control of the premises with the concessionaires. The fact that the seats which collapsed were defectively constructed is established, and under the facts as disclosed by this record the plaintiff in error is liable. It procured the exhibition to be given on its grounds and the public were invited to attend. By its contract and its general custom it assumed the supervision of the construction of the concession and any repairs that might be made thereon, and reserved the right to eject the concessionaires and their property from the park in case of non-compliance with any of its rules or requirements. Under these facts plaintiff in error does not, as it contends, come within any rule which governs in cases where injuries have been sustained on premises which are in the exclusive possession of the lessee, and it was its duty to exercise ordinary care to prevent injury to those who visited the attraction known as the Florida Zoo. As is said by Cooley in his work on Torts, (2d ed. p. 718:) "One is under no obligation to keep his premises in safe condition for the visits of trespassers. On the other hand, when he expressly or by implication invites others to come upon his premises, whether for business or for any other purpose, it is his duty to be

reasonably sure that he is not inviting them into danger, and to that end he must exercise ordinary care and prudence to render the premises reasonably safe for the visit. Many cases illustrate this rule. Thus, individuals holding a fair and erecting structures for the purpose are liable for injuries to their patrons caused by the breaking down of these structures through such defects in construction as the exercise of reasonable care would have avoided."

Defendant in error contends that the questions here involved are governed by the holding in *Stickel* v. *Riverview Sharpshooters Park Co.* 250 Ill. 452. While in that case the question for consideration was the obligation of the park company to see that the devices and attractions which are operated by the concessionaires are reasonably safe for the purposes for which the public are invited to use them, we see no difference, in principle, between the question involved in that case and the one involved here. It is true that in this case the attraction operated by the concessionaires, being the exhibition of certain animals, was not of such a character as would probably cause injury unless due precautions were taken to guard against it; still it was necessary, in order to give the exhibition and to afford accommodations for the patrons to view the exhibition, to erect elevated seats. The seats were a necessary part of the exhibition as it was then being given, and we think, under the reasons given in the *Stickel case, supra,* that the park company was under the same obligation to see that such a structure was reasonably safe as it was to see that the device or attraction itself was reasonably safe for the purpose for which the public was invited to use it.

The evidence establishes the liability of plaintiff in error, and the superior court properly refused the peremptory instruction.

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*