THE NEW YORK, NEW HAVEN AND HARTFORD RAIL-
ROAD COMPANY *vs.* BENJAMIN A. ARMSTRONG ET ALS.

Second Judicial District, Norwich, April Term, 1917.
PRENTICE, C. J., RORABACK, WHEELER, GAGER and CASE, Js.

The title to the soil under the navigable waters of a cove below low-
water mark is in the State as trustee for the public, subject to what-
ever privileges or franchises adjoining proprietors may have.

Subject to the paramount right of Congress to control the navigation
of those waters in the regulation of commerce, the State may grant
or dispose of the land thereunder for any public use, when that can
be done without substantial impairment of the general interest.

The grant of such land for the construction of a railroad thereon is for
an undoubted public purpose, and the acceptance of the grant by
the railroad company puts an end, *pro tanto*, to the rights of ad-
joining riparian proprietors in such land.

In the present case the railroad company was authorized and empowered
(4 Private Laws, p. 967) to locate, construct and finally complete a
single, double or treble railway from some suitable point in New
Haven to some suitable point in New London, and to lay out its
road "not exceeding six rods wide" through its whole length. In
1851 a single-track road was laid out, located and constructed, and
in 1892 another track was added. Across the tide waters of Shaw's
Cove near New London these tracks were built upon piles and
wooden trestles. Apparently there was no vote of the railroad
company designating any particular layout or location, or defining
its width, except that the center line of the road as constructed was
the center or middle line of its right of way. *Held:*—

1. That under these circumstances there was no presumption that the
   railroad company had located its right of way to the full width
   permitted by its charter.

2. That actual occupancy by the railroad company within the limits of
   the six-rod strip had determined, up to the present time, the width
   of the railroad location, including in it, however, such additional
   space adjoining the trestle and piling as might be reasonably re-
   quired for its security and support, or for that of a more solid and
   permanent viaduct should that be substituted.

3. That the grant suspended all right of entry by adjoining riparian
   owners upon the six-rod strip over the navigable waters of Shaw's
   Cove; and that in the present case such suspension would continue
   in force until an abandonment of the grant by the railroad company.

4. That the plaintiff had not exhausted its right of location by laying

two of its tracks at different times, inasmuch as the charter clearly contemplated future growth and necessities and a gradual utilization of the six-rod strip.

5. That the question whether the plaintiff had abandoned its right of option to make a further location, while of great public importance, was one of fact upon which the trial court had not passed.

6. That the grant was limited to railroad uses and purposes, and conferred upon the plaintiff no riparian rights which were incident to the ownership of uplands; and that no such riparian rights were vested ·n the plaintiff by virtue of a city vote or by a deed from an individual.

The defendants owned upland to the north and west of the plaintiff's trestle, and had filled in the intervening space and built thereon an oil plant; and on the southeasterly side of the trestle, and within the six-rod strip, had recently erected a platform to which gasoline and oil, intended for sale, were to be carried by three large pipes running through the railroad trestle and piling. *Held:*—

1. That assuming the defendants and their predecessors were riparian owners contiguous to the six-rod strip, a finding that they had either been compensated for any injury to their rights as such owners or had abandoned such rights, was a reasonable inference of fact as to that part of the six-rod strip over which the plaintiff had in fact laid out its railroad, but not as to the rest of the strip, upon which the railroad company had not exercised its right of location.

2. That under its grant, the space occupied by the railroad company was permanently devoted to its exclusive use for railroad purposes; that the use which the defendants proposed to make of the railroad property was inconsistent with its control by the railroad and dangerous to public safety; and that it was the plaintiff's imperative duty to keep such pipes, although not attached to the trestle, away from its location.

Argued April 25th, 1917—decided January 22d, 1918.

SUIT to restrain the defendants from constructing a platform or wharf in New London harbor upon land alleged to belong to the plaintiff, and for an order requiring them to remove certain piling and piers already built, brought to and tried by the Superior Court in New London County, *Shumway, J.;* facts found and judgment rendered partly in favor of each party, but denying the relief asked for, from which each party appealed. *Error on plaintiff's appeal; no error on defendant's appeal.*

New York, N. H. & H. R. Co. *v.* Armstrong.

In 1848 the General Assembly of Connecticut granted the plaintiff's predecessor in title a charter, portions of which are printed in the foot-note.    4 Private Laws, p. 967.

The plaintiff's predecessor duly accepted said char-

"Section 1. . . . And said company is hereby authorized and empowered to locate, construct and finally complete a single, double or treble railway or railroad, from some suitable point in the city of New Haven . . . to some suitable point in the city of New London. . . . And for the purpose of constructing said railroad or way, the said company is hereby authorized to lay out their road not exceeding six rods wide through the whole length, and for the purposes of cutting and embankments and for the purpose of necessary station houses, turnouts and for obtaining stone and gravel, may take as much more land as may be necessary for the proper construction and security of said road."

"Sec. 7. . . . And it shall be lawful for said company to enter upon and use all such franchises, lands and real estate as may be necessary for them, in the manner and for the purposes set forth in the first section hereof; . . . *Provided*, that said railroad shall not be worked upon or opened across the lands of any person, until the damages assessed to such person shall have been paid or secured to be paid to his satisfaction, . . . *Provided*, that it shall not be necessary in order to the location of said road by the directors and the approval thereof by the commissioners, that the width thereof shall be definitely established by said directors or commissioners, previous to said location; but before the damages shall be assessed to any landholder by the appraisers, the width of said railroad shall be definitely fixed and established by said directors over and across the land so taken, upon one or both sides of the line so located."

"Sec. 9.    That said company is hereby authorized to construct, erect, build, make and use a single, double or treble railway or road, of suitable width and dimensions, to be determined by the directors of said company, on the line or course by them designated."

"Sec. 10.    That whenever it shall be necessary for the construction of their single, double or treble railroad or way to intersect or cross any stream of water or watercourse, or any road or highway, it shall be lawful for said company to construct said railroad across or upon the same; but the said company shall restore the said stream or watercourse, or road or highway thus intersected, to its former state or in sufficient manner not to impair its usefulness."

"Sec. 19.    Whenever said railroad shall cross any streams, coves or creeks, navigated by vessels at or above the place of such crossing, the said company shall erect draws of such width, or culverts of such height, as will suitably and conveniently accommodate such navigation."

ter, and in 1851 lawfully laid out, located and constructed its single track railroad in New London to and across the tide and navigable water known as Shaw's Cove where the same adjoins the Thames River; the center line of said location is the center line of the railroad bed and construction, as the same was then made and as it now exists.

In 1892 the plaintiff located, laid out and constructed another track. Both of these tracks were constructed upon piles and trestles closely built.

Over the part of this six-rod strip occupied by these tracks and trestle, the plaintiff and its predecessor have exercised the exclusive, continued use and control under a claim of right. When the plaintiff's predecessor constructed its single track in 1851, the waters of the cove flowed over all of the said six rods. The plaintiff built a drawbridge across Shaw's Cove over a part of its track, and through this, over the waters of the cove, navigation has been, and may be, had by the defendants and others.

In 1899 the defendants acquired title to a strip of land bounded northerly thirty feet on Bank Street and southerly by the waters of Shaw's Cove. Since their purchase the defendants have filled in between their upland and the southwest side of the trestle work of the plaintiff, and an oil plant has been constructed on the west side upon the land so filled. On or about June 2d, 1910, the defendants began constructing spiling for a platform on the southeasterly side of the plaintiff's tracks within the said six-rod strip. The defendants, at about the time of bringing this action, had placed three large pipes designed to carry gasoline and oil through the trestle and spiling from the proposed tanks upon the platform on the southeast to the tanks upon the filled-in land upon the northwest of the trestle. If the defendants are permitted to maintain the struc-

ture occupied by the Texas Oil Company on the west of the railroad, or to occupy the said six-rod space southeast of the trestle, the plaintiff will be cut off from approach to its trestle and tracks from either side.

The plaintiff, in the development of its business, will need to construct more railroad tracks upon and through said six-rod strip, and for such purpose will need to occupy more of said strip for the construction of its trestle, roadbed and tracks.

The plaintiff can replace or repair its trestle and tracks, upon the trestle, but this method increases the expense and danger to railroad and the public, and is attended with more delays to trains, than if the work could be done on either side of the trestle.

*Leonard M. Daggett* and *Frederick H. Wiggin,* for the appellants (defendants).

*Hadlai A. Hull* and *Charles B. Whittlesey,* with whom were *Frank L. McGuire* and *C. Hadlai Hull,* for the appellant (plaintiff).

WHEELER, J.  We have incorporated in the foregoing statement, facts which the motion to rectify and the motion to correct do not successfully criticize.  We omit those facts which are especially pertinent to the title of those who claim, or are claimed, to be upland owners, since in our view the case may be decided without passing upon their title.

The motion to correct should be sustained in part. Certain material facts of the finding, as we read the evidence, do not appear to be supported by it.  The findings that the railroad's location and layout was six rods in width across Shaw's Cove, and as such was duly approved, adopted and accepted by the railroad, and

that it has, ever since its location in 1851, occupied said space throughout its whole width of six rods, being three rods on each side of the center line of its location, and has exercised continued use and control of the same under a claim of right, and that the plaintiff and its predecessor have always claimed that their charter gave them the right to build six rods wide over and across Shaw's Cove,—are not supported by the evidence. We are unable to find testimony of a layout six rods wide, or of the acceptance by vote of a layout of any named width. Nor do we find testimony of any act of occupancy, except the location of the trestle with the two tracks. Nor do we find any testimony that the plaintiff has exercised, on the southeasterly side of its railroad, a right of approach for the purpose of repairing the trestle and tracks, nor that it has repaired the trestle by approach by water from either side of the trestle, or over the land filled in on the west by the defendants. The finding that the railroad possesses such a right of approach, we regard as one of law.

The finding that the defendants' predecessors, if entitled to compensation, had been compensated for interference with any wharf and reclamation rights belonging to them, or had abandoned claim to the same, was justified as a reasonable inference as to the part occupied by the trestle and its necessary support, but not as to the rest of the six-rod strip. The finding that the defendants' pipes were designed to carry other highly inflammable materials in addition to gasoline and oil, is unsupported by the evidence. Paragraphs 44 g, n, and o, of the motion to correct, should have been allowed. These relate to the existence of the foot-bridge maintained for upward of twenty-five years by the city of New London across this cove, attached to the trestle, and to the spur-track laid for the benefit of defendants over this strip. Both the foot-bridge

and spur-track are shown on Exhibit A, which should have been attached to the finding in the form it was in when admitted in evidence. The defendants' motion to rectify the appeal should be allowed, and the finding corrected by striking out paragraph 31, and by including the fact that the figures and lines mentioned in paragraphs 7 and $63\frac{1}{2}$ were superimposed upon a copy of defendants' Exhibit A after the hearing, and cannot be seen by an inspection, and were not seen by the trial court upon the examination of the premises. Paragraph 57 of the finding we regard as a conclusion of law and not as a finding of fact.

These corrections being made, we think the plaintiff entitled to a judgment, and hence there is no error on defendants' appeal.

As we view the case, it will be unnecessary to consider what, if any, rights of reclamation and wharfage the defendants may have in Shaw's Cove. We shall assume, without deciding, that the defendants are riparian owners on either side of the six-rod strip in controversy. The title to the soil under the waters of Shaw's Cove below low-water mark was in the State as trustee for the public, subject to whatever privileges or franchises adjoining proprietors might have. *Richards* v. *New York, N. H. & H. R. Co.*, 77 Conn. 501, 505, 60 Atl. 295. In the exercise of its sovereignty, the State had the right to grant the land under these waters for any public use "when that can be done without substantial impairment of the public interest, and subject to the paramount right of Congress to control their navigation so far as may be necessary for the regulation of commerce." *Saunders* v. *New York Central & Hudson River R. Co.*, 144 N. Y. 75, 85, 38 N. E. 992; *Shively* v. *Bowlby*, 152 U. S. 1, 47, 14 Sup. Ct. 548; *Illinois Central R. Co.* v. *Illinois*, 146 U. S. 387, 13 Sup. Ct. 110.

The State's grant to the plaintiff's predecessor was for an undoubted public pupose, and, so far as the grant was accepted, the franchise of these riparian owners ended. Whether the grant to locate and lay out the railroad across Shaw's Cove could be made without compensation for any rights of adjoining riparian owners found to exist, need not now be determined. The charter is to be construed in all its parts as an entirety. Section 10 is an express authorization to the plaintiff's predecessor to construct its railroad across this cove, provided the watercourse be restored so as not to impair the usefulness of the waters of the cove. This was accomplished by building a drawbridge opening into the cove. The grant empowered the railroad to locate, construct, and finally complete a single, double, or treble railroad between named *termini*, and authorized it to lay out the road "not exceeding six rods wide through the whole length."

A public grant by charter to a railroad to lay out its road six rods wide, followed by an acceptance of the charter and the construction of a single-track railroad upon the six-rod strip, might well be held to constitute in law an acceptance of the location and layout of the railroad for the entire six rods, even though the precise width of layout was not specified in the vote of acceptance. The legislature would then have established the width of the railroad, and the railroad company could not lay out one of lesser width; hence, if it accepted the charter, it accepted the width of the right of way as determined by the legislature.

The charter granted to the plaintiff's predecessor, however, did not authorize a location and layout of a fixed width, but one "not exceeding" six rods wide, and by the terms of § 1, this width extended over the whole length, which included the location over this cove.

Some of the cases hold that a railroad having an optional grant of this character, in the absence of affirmative action on its part limiting its appropriation of its right of way other than its entry upon and construction of its road over and through a part of the way granted, must be conclusively presumed to have taken and held all of the location to the full width permitted by the charter. *Prather* v. *Western Union Tel. Co.*, 89 Ind. 501, 525; *Williams* v. *Delaware, L. & W. R. Co.*, 255 Pa. St. 133, 99 Atl. 477. Other cases appear to hold the contrary: *Philadelphia & Reading R. Co.* v. *Obert*, 109 Pa. St. 193, 1 Atl. 398; *Leidigh* v. *Philadelphia, H. & P. R. Co.*, 215 Pa. St. 342, 64 Atl. 539; *Fort Wayne, C. & L. R. Co.* v. *Sherry*, 126 Ind. 334, 25 N. E. 898. Before the law can draw this presumption, there must be a probable inference—which our common sense, enlightened by our knowledge and experience, draws from the fact of entry upon a part of this right of way granted—that the railroad in fact located and laid out its road over the whole six-rod right of way which the charter gave it the right to do. The application of this test does not satisfy us that this presumption is a probable inference in this case. The railroad might have evidenced its acceptance of the entire location by defining the location and layout, and the extent of its designation would measure the extent of the acceptance of the grant. Or the acceptance and designation of the location and layout might have been evidenced from acts of possession, as by setting out monuments, or by the physical location of roadbed and tracks. In the case before us, the vote of the railroad was duly passed, and approved by the commissioners, designating the center line of the road, including that across Shaw's Cove. No vote of the railroad designating the acceptance of any particular location and layout appears to have been passed. It may, or it may not, be to its

advantage to possess the entire six-rod strip. If it does possess it, all the liability of ownership follows, and burden of taxation and of responsibility for injuries attach. The charter gave the railroad the right to take some or all, and the law ought not to take away from it its right to exercise its option. We have no setting of monuments in the record. The railroad's only acts of possession are its location of first one and then another track, and its building of the trestle. We have no occasion to refer in detail to cases in other jurisdictions, since in *Williams* v. *Hartford & N. H. R. Co.*, 13 Conn. 397, we held that, in the case of a charter providing for a location not exceeding six rods wide, the definite establishment by the railroad of a center line only did not define the width of location, and therefore there was no roadway in existence which could be appraised in condemnation proceedings. The same rule was admitted by counsel and recognized by the court in *New York & N. E. R. Co.* v. *New York, N. H. & H. R. Co.*, 52 Conn. 274, 279. The rule so adopted and recognized is decisive that the acceptance of the grant and the mere establishment of the center line does not define the width of the location. It necessarily follows that no presumption can be drawn that the railroad company has taken and held all of the location to the full width permitted by the charter. So much of this six-rod strip as the railroad has actually occupied constitutes, up to the present, the limits within which the railroad company has seen fit to exercise its option under its grant. A mere acceptance of a charter granting to a railroad company the right to locate and lay out its railroad not exceeding a named width, followed by its occupation for railroad purposes of a part of this named width, does not create a presumption that the railroad intended to locate and lay out, or has located and laid out, its road over the entire width of the strip.

*Williams* v. *Hartford & N. H. R. Co.*, 13 Conn. 397; *New York & N. E. R. Co.* v. *New York, N. H. & H. R. Co.*, 52 Conn. 274.

The defendants concede that the occupation of a part of this strip, first for a single track and later a double track, located and laid out the railroad to the extent at least of the physical user. The mere physical occupation of the trestle does not and should not mark the extent of the location and layout. The spiling may require support above the bed of the cove, now or hereafter; some of the soil on the outer side of the spiling may be required to provide security for the spiling. The space and bed of the cove outside the line of the spiling, so far as they may be reasonably necessary for these purposes, are and should be included as a part of the location and layout of the plaintiff. It is also reasonable to hold that the trestle of wood may in due course give place to a permanent way of masonry, or rock and filling, or of bridging built of other material. Additional space too, may be required for additional supports, or wings or embankments, if any of these substitutions should be made. Whatever space is reasonably required for these purposes lying outside the lines of the present trestle, must be presumed to have been included as a part of the occupation of the trestle. No narrow rule should be adopted in passing upon the acceptance of a public grant where the welfare of the public is involved. How much additional space to that occupied by the present trestle will be required to furnish to it adequate support, or to provide for the substitution for it by way of a permanent way, or another form of trestle or bridging, does not appear in the finding. That it will be a substantial addition to the space actually occupied by the trestle, is evident, and that the defendants have encroached upon this space on either side of the trestle is likewise evident

from the proximity of the reclaimed land, and the platform they assert ownership over.

We have assumed, for the purposes of this case, that the defendants are riparian owners contiguous to this six-rod strip, and, in the absence of the grant to the railroad, entitled to build across it and beyond it subject to the rights of navigation and the public use.

The finding that defendants' predecessors, if riparian owners, have either been compensated for this strip or have abandoned claim for compensation thereto, is a reasonable inference of fact as to the part of the six rods over which the plaintiff has in fact laid out its railroad, in view of the provision in the charter for compensation and from the long occupation and absence of claim for compensation. As to the rest of the strip, no compensation can be presumed to have been made, for over it the plaintiff has not exercised its right to locate and lay out its railroad.

The grant, by its charter, to the plaintiff's predecessor to locate, lay out and construct its railroad over Shaw's Cove, permanently devoted the space which the railroad company occupied under its grant to the exclusive use of the railroad company for railroad purposes. We read this purpose in the charter, and we find it a thoroughly settled principle of our law. *Fitch* v. *New York, P. & B. R. Co.*, 59 Conn. 414, 419, 20 Atl. 345; *New York & N. E. R. Co.* v. *Comstock*, 60 Conn. 200, 209, 22 Atl. 511. The defendants recognize this general rule of law, but attempt to qualify it by the limitation that the exclusive occupation is only "so far as this is necessary or convenient for the safe and proper operation of the railroad business." The practical effect of such a qualification would place upon the railroad company the burden of proving, in each case, the necessity or convenience, and give to the riparian owner a right of passage over the tracks and a right to lay pipes

or build a conduit under the tracks. Railroading is a dangerous business; the railroad company's right of way and tracks must be under its control; consideration for the safety of the public should forbid any save the railroad employees from being upon the tracks, and forbid any foreign uses of the railroad, trestles, its embankments, or way upon or below the surface of its tracks. There is no other way of safely conducting the business. When repairs or renewals are to be made, the railroad company ought not to be required to care for pipes and apparatus running through its location, or to wait until the owner of these has been found and has cared for them. It could not, under the suggested qualification of this rule, permit pipes in which gasoline and kerosene oil flowed to be maintained through its wooden trestle. The liability of a break in the pipes through an accident upon the railroad, or otherwise, and the danger that the inflammable oil would be ignited, with the consequent destruction of trestle and rolling stock upon it, impose upon the plaintiff an imperative private and public duty to keep these pipes from its location. In the cases cited, we gave reasons for our holding that a railroad company had the exclusive use of its location and layout for railroad purposes, which seem to us controlling. Those cases upon which the defendants rely, which hold that the owner of the way has the right to minerals under the railroad easement, deny his right to enter upon the railroad location to take them, and compel him to drive a tunnel from his own adjoining land, leaving sufficient support for the railroad easement. The adjoining owner may not enter upon the railroad location, for, these cases say, its business requires exclusive possession of the surface by the railroad. In a case cited by the defendants, *Southern Pacific R. Co.* v. *San Francisco Savings Union,* 146 Cal. 290, 79 Pac. 961, it is held (p. 295) that "under the

condemnation the railroad company·acquires the permanent and exclusive control of the surface of the land." The trestle, or the embankment, are above the bed of the cove, that is, above the surface of the land, and under this class of cases no right of an adjoining owner exists to enter *in invitum* upon the railroad location, or to run pipes through trestle or embankment in the absence of legislative authority. It is immaterial that these pipes are not attached to the trestle, they are within the railroad location, of which the railroad company has the exclusive possession, interference with which is a violation of a clear legal right.

We have already pointed out one effect of the failure of the railroad to locate and lay out its road over any part of this strip not actually occupied by its road. Let us see the situation the unlocated part of the grant to the railroad company is left in. The grant suspended all right of entry by adjoining riparian owners upon this six-rod strip over the waters of Shaw's Cove. So long as the grant continued, the riparian owners could not lawfully enter upon this strip. There were only four ways in which the grant could be terminated: by formal act on the part of the General Assembly, by judgment of court, by a voluntary surrender, or by an abandonment of the grant by the railroad company. No judgment of court has been rendered. The General Assembly has not sought to terminate the grant,·and the railroad company has made no effort to surrender it; therefore, unless the railroad company has lost its right to exercise its option of location by an abandonment of this privilege, it still remains. We have not failed to consider the defendants' claim that the plaintiff has exhausted its right of location by the exercise of its option and the laying at different times of its two tracks. We do not think the railroad company was required to exercise its option on any single occasion or

occasions, or within any precise period of time. The terms of the charter seem to plainly indicate this, for the railroad is authorized "to locate, construct and finally complete a single, double and treble railroad." The grant was intended to provide a railroad between named *termini*, not only for the then present, but for the long future. It was not expected that the new line would in the beginning utilize for operation its entire location. The single track was sufficient for 1851, the double for 1892. Public necessity may later on require an additional track, and the General Assembly contemplated by its grant provision for future growth and needs. If the railroad company's exercise of its option under the grant can be exhausted by the exercise of its option to lay first one and then another track, the same reason exists for finding an exhaustion of power in one exercise of its option as in two. But neither the defendants nor any one else has ever claimed that the railroad company exhausted in 1851 its right to thereafter locate another track; and no one claims that the location of 1892 is not valid. This concession makes it logically impossible to contend that the railroad company exhausted its power of location by its location of 1892.

Whether the railroad company has abandoned its option of further location over this six-rod strip, is a question of fact, *Chatfield Co.* v. *O'Neill*, 89 Conn. 172, 175, 93 Atl. 133, and one not found by the court nor passed on by it. The finding is not sufficiently explicit in its presentation of the subordinate facts upon which the conclusion of abandonment must rest, to admit of a finding, much less to permit such a conclusion as one of law. The high public importance of this finding make it one for the exercise of great care and large wisdom.

The plaintiff claims, in addition, certain rights in this six-rod space, through its possession of riparian rights of ownership by virtue of the grant from the State over

the waters of Shaw's Cove, the land conveyed to it by Brown, and by the vote of the city. The grant from the State was to locate, lay out and construct a railroad for the purposes of a railroad. The railroad right of way in such a case is held only for railroad purposes, "and does not include the riparian rights which are incident to the ownership of uplands." *In re City of Buffalo*, 206 N. Y. 319, 320, 99 N. E. 850. The vote of the city to authorize the railroad company to construct its road upon and across certain lands of the city, which included Shipyard Street, was not intended to convey anything further than a railroad easement. The Brown deed, which conveyed a strip adjoining this street, by its terms intended to exclude from its grant riparian rights. The land adjacent to and southerly of the land conveyed by Brown, acquired by the railroad company by condemnation, gave to it no riparian rights. The land conveyed by the Perkins deed appears to convey riparian rights, but of this we cannot be certain; for the finding does not locate the premises conveyed, and the evidence is not sufficiently definite to locate them; we incline to the opinion that the land therein granted was located, as the defendants claim, at the opposite side of Shaw's Cove, but of this we cannot be certain.

There is no error on defendants' appeal.

There is error on plaintiff's appeal, the judgment is reversed and the cause remanded for hearing as to the extent of the actual occupation of the plaintiff upon said six-rod strip, and a judgment in favor of plaintiff is directed in accordance with prayers 2 and 3 as to said part of said strip, and also a judgment in favor of plaintiff in accordance with prayer 4, all as set forth in this opinion.

In this opinion the other judges concurred.