74 So.2d 1 (1953)
225 La. 706
CALIFORNIA CO.
v.
PRICE et al.
No. 41130.
Supreme Court of Louisiana.
December 14, 1953.
On Rehearing May 31, 1954.
*2 Liskow & Lewis, Lake Charles, Doyle, Smith & Doyle, New Orleans, for defendants-appellants.
Fred S. LeBlanc, Atty. Gen., James R. Fuller, Dixon Carroll, Sp. Asst. Attys. Gen., John L. Madden, Asst. Atty. Gen., for defendants-appellees.
HAMITER, Justice.
The California Company, a corporation organized in the State of California and qualified to do business in Louisiana, instituted this concursus proceeding to determine the ownership of funds representing accumulated oil royalties from eight producing wells drilled in the bed of Grand Bay in Plaquemines Parish and located in Sections 17, 19, 20 and 22, Township 19 South, Range 18 East.
Grand Bay is a body of salt water, navigable in 1812 and also presently, lying east of the Mississippi River at or near the southern extremity of Breton Sound and connecting with the Gulf of Mexico. The State of Louisiana, by virtue of its inherent sovereignty and in view of the navigable character of such Bay, acquired title to the bed thereof when admitted to the union on an equal footing with the thirteen original states.
Under date of November 4, 1874, in consideration of the prior payment to it of the sum of $1,695.48, the State issued patent No. 1965 which recited a grant and sale to John Beckwith of certain described lands in Township 19 South, Range 18 East, approximately a total of 6,439.29 acres, including the sections above named in which the bed of Grand Bay lies. The patent was signed by the Governor and the Registrar, *3 and it was recorded in the State Land Office.
From the State of Louisiana, represented by the Mineral Board, and also from the heirs and successors of John Beckwith, the California Company obtained separate mineral leases, pursuant to which the wells in question were drilled and production obtained. And in this proceeding it has impleaded those adverse claimants, they being referred to hereinafter as "State" and "Beckwith group", respectively.
The principal contention of the State is that the bed of Grand Bay (a navigable arm of the sea when Louisiana was admitted into the union in 1812 and then owned by it by virtue of its inherent sovereignty, all as above shown) is insusceptible of private ownership and has never been disposed of validly.
Alternatively, the State urges a derivative title thereto predicated on an adjudication to it in 1883 for unpaid taxes of 1881 and 1882 under an assessment in the name of John Beckwith. Also, in the alternative, the State pleads several prescriptions of 10 and 30 years
Those in the Beckwith group deraign title from and claim under the mentioned patent No. 1965, issued by the State in 1874 to John Beckwith, they admitting, however, that their ownership of the bed of Grand Bay under the patent has been and is now subject to public rights of commerce, navigation and fisheries. Additionally, they specially plead the prescription of six years under Act No. 62 of 1912, LSA-R.S. 9:5661, averring that it has foreclosed any rights the State previously had to question the validity of the Beckwith patent.
Regarding the State's first alternative contention they assert that the tax deed did not describe and, therefore, did not include the land in dispute; and that the purported tax sale was invalid and has been cancelled by authorized State officials. The other alternative claims of prescription made by the State are also contested.
Without passing upon any of the alternative pleas of the State the district court, following the trial, rendered a judgment declaring that claimant to be the owner of the royalties due and to become due from the eight producing oil wells located in the bed of Grand Bay, and dismissing the claims of the Beckwith group.
The Beckwith group appealed. The State has answered the appeal, asserting that the judgment is correct for the written reasons assigned by the district court, and reasserting additionally all other contentions and pleas made by it.
In reaching his conclusion the district judge, to quote from his assigned written reasons, said in part:
"Prior to the enactment of the Louisiana Constitution of 1921, Article IV, Section 2, the Legislature of Louisiana was not prohibited from alienating the beds of arms of the sea. However, the public policy of this State, as declared by the Legislature, has always been to place sea-bottoms within that class of things which are to be considered insusceptible of private ownership and therefore inalienable by the State of Louisiana. * * *

* * * * * *
"Under the provisions of Act 62 of 1912 [LSA-]R.S. 9:5661, proceedings by the State of Louisiana to annul patents issued by the State must be brought within six years of the issuance of the patent, or, in the case of patents issued prior to 1912, within six years of the passage of Act 62. The instant case does not involve the validity of the patent issued John Beckwith in 1874 but rather, the extent of the land, conveyed by the patent. The patent by its terms covers a large quantity of swamp and marsh land, and according to the acreage described would include the bed of Grand Bay. As to the swamp and marsh lands the patent stands. However, the patent cannot be said to have conveyed property that was insusceptible of private ownership. There is nothing in Act 62 of 1912 which would convert things which are insusceptible of private ownership into *4 property that is alienable by the State. If Act 62 does so, it is only by an inference that this Court does not find in the Statute. * * *"
Contrary to the initial argument of the State, and as was correctly concluded by the trial judge, patent No. 1965 issued to John Beckwith in 1874 did describe, and it purported to convey, the bed of Grand Bay. The descriptions of the property sought to be transferred, as the patent recites, were "according to the official plat of the survey of said lands in the State Land Office"; and Grand Bay, as portrayed and delineated by sections on such plat, conformed with and was included in those descriptions. That being true, it is not exactly correct to say that the instant case does not involve the validity of the patent but, rather, it presents the extent of the land conveyed by the patent.
The members of the Beckwith group concede that the State at one time might have successfully urged the invalidity of the assailed patent, the Governor and Register of the State Land Office (the signing officials in 1874) not having had any specific authorization from the Legislature to execute the instrument. But they show that prior to 1921 there was no constitutional prohibition respecting an alienation by the State of the bed of a body of navigable water, including Grand Bay; and they contend that, because of the State's inaction, any such right to attack the patent has been barred by the prescription of six years as established by the provisions of Act 62 of 1912, Section 1 of which states:
"* * * That all suits or proceedings of the State of Louisiana, private corporations, partnerships or persons to vacate and annual any patent issued by the State of Louisiana, duly signed by the Governor of the State and the Register of the State Land Office, and of record in the State Land Office, or any transfer of property by any sub-division of the State, shall be brought only within six years of the issuance of patent, provided, that suits to annual patents previously issued shall be brought within six years from the passage of this Act."
The State, countering, insists that such statute is not applicable here. In this connection it argues first that the bed of Grand Bay is classed as "sea shore" which, according to the Louisiana Statutes Annotated-Civil Code, Articles 450 and 482, constitutes "common property" available to all persons and insusceptible of private ownership. At the same time it concedes (both in brief and in oral presentation of the case), however, that prior to 1921 the Legislature had the power to change the mentioned codal or legislative declarations and to make such property alienable to individuals. In effect its position, therefore, is that the property would have been susceptible of private ownership had it not been for the mentioned codal articles; and that because of the prohibition therein contained the bed of Grand Bay was inalienable and the prescriptive statute relied on has no application.
In State v. Richardson, 140 La. 329, 72 So. 984, 986, which presented the question of whether the property there in dispute was a part of the bed of Red River (a navigable stream), this court said: "It can hardly be denied that anything which constitutes property, or an interest in property, and which possesses any value, or conceivable value, for any purpose whatever, is susceptible of private ownership, unless there be some law to the contrary. The `law to the contrary,' in this instance, is said to be that which declares that the beds of navigable rivers are `public,' and hence not susceptible of private ownership. * * *" The "`law to the contrary'" in the present litigation, as before shown, is said to be the provisions of LSA-Civil Code, Articles 450 and 482. It is not at all certain that they provide the prohibition here contended for, since the court made no reference to them in State v. Bayou Johnson Oyster Co., Limited, 130 La. 604, 58 So. 405, 410, which involved a dispute over similar tidewater bottoms, when it commented: "It may be, and probably is, true that there is no legal impediment in the way of the state's alienating such property in favor of particular individuals or corporations, save in so far as such alienations *5 might conflict with the power vested in Congress to regulate interstate and foreign commerce; * * *."
But assuming for the sake of argument that the mentioned codal provisions are applicable and forbade an alienation of the property involved here, the prohibition is and could be no different, insofar as the prescriptive statute is concerned, from that found in other legislative declarations which rendered beds of navigable rivers, streams and lakes insusceptible of private ownership.
In the latter class was the bed of Duck Lake, a navigable body of water, which furnished the contest in the recent case of Humble Oil & Refining Co. v. State Mineral Board, 223 La. 47, 64 So.2d 839, 840 (such decision, it is fair to state, was rendered subsequent to the judgment of the district court in the instant cause). Under the authority of Act No. 97 of 1890, LSA-R.S. 38:691 et seq., the State sought to grant such bed, along with other lands, to the Atchafalaya Basin Levee District. Later, the Levee District purportedly conveyed the property to private corporations and individuals. In the dispute between the State and the private purchasers (referred to in the opinion as "Salt Domes") the former contended that the bed of Duck Lake was sovereignty land, because of its navigable character, and hence was not covered by, and could not be granted to the Levee District under Act No. 97 of 1890. As a defense, Salt Domes pleaded the prescription of six years under the 1912 statute. The court commented in part and concluded as follows: "We do not deem it essential to consider the merits of the title claims of either the State or Salt Domes because it is perfectly apparent, from the foregoing statement of the case, that whatever right the State may have had to contest the title of Salt Domes has long since been barred by the peremption of six years provided by Act No. 62 of 1912. * * *
"By an unbroken line of jurisprudence, this Court has held that the failure of the State to institute suit to annul a patent or transfer of land by one of its sub-divisions within six years from its date, or within six years from the effective date of Act 62 of 1912 when the patent or deed had been executed prior to its passage, operates as a tacit confirmation which thereafter renders the title unassailable. State v. Sweet Lake Land & Oil Co., 164 La. 240, 113 So. 833; Realty Operators v. State Mineral Board, 202 La. 398, 12 So.2d 198 and O'Brien v. State Mineral Board, 209 La. 266, 24 So.2d 470.
"Counsel for the State acknowledge the force of these pronouncements but it is professed that they are inapplicable in this instance for the reason that, in the cited cases, the Court was dealing with lands which the State had been authorized to sell, whereas, here it is contended that the State could not transfer the bed of navigable waters under Act No. 97 of 1890 as that statute sanctioned only the conveyance to the Levee District of lands properly acquired from the United States as swamp and overflowed lands and those forfeited for non-payment of taxes.
"The answer to this proposition is that, inasmuch as the bed of Duck Lake was unquestionably embraced in the transfer of vacant lands executed on May 18th 1901 by the Register of the State Land Office and the State Auditor in favor of the Atchafalaya Basin Levee District and inasmuch as this property was taken out of the public domain by conveyance of said Levee District to private parties, it is a matter of no importance whether the deed of the public officers was beyond the powers vested in them by Act No. 97 of 1890. The transfer being an accomplished fact and the property having been acquired by private tranferees, the State was accorded six years to contest the matter. Failure to institute suit within that time constituted a ratification of the action of its officers in disposing of the property. See Atchafalaya Land Co. v. F. B. Williams Cypress Co., 146 La. 1047, 84 So. 351, 358."
In the instant case, as in the one just discussed, the bed of the navigable body of water (Grand Bay) was inalienable and *6 not susceptible to private ownership because it was sovereignty land and certain legislative declarations (so the State contends) prevented an effective transfer thereof. However, in 1912, the Legislature, as it had a right to do, provided in a statute of repose a modification of those declarations to the extent of giving legislative recognition and sanction to any transfer of property by the State or a subdivision thereof when made in a specified form and when suit to annul it had not been timely instituted. Here, the patent was regular on its face and duly recorded, all as required by that statute; and the attack thereon was not made within the time prescribed.
Again, the State says that the Act of 1912 is not applicable to the instant patent, and was not intended to affect the bed of a navigable body of water such as Grand Bay, as is fully shown by a series of legislative acts (all adopted after the Beckwith patent was issued) commonly known as the Oyster Statutes and being Acts Nos. 106 of 1886; 52 of 1904; 189 of 1910; 54 of 1914; 139 of 1924; and 67 of 1932, LSA-R.S. 56:421 et seq. These statutes, as their titles indicate, purport to regulate the oyster industry in the State of Louisiana, and they relate to all beds and bottoms of rivers, bayous, lagoons, lakes, bays, sounds, and inlets bordering on or connecting with the Gulf of Mexico within the territorial jurisdiction of the State of Louisiana.
The Act of 1886, in Section 1, refers to all of the described property and recites: "* * * and not heretofore sold or conveyed by special grants or by sale by this State, or by the United States to any private party or parties, shall continue and remain the property of the State of Louisiana, * * *."
The Acts of 1910 and 1914, insofar as pertinent, are practically alike. Sections 1 thereof make reference to the above mentioned beds and bottoms and state that they "* * * shall be, continue and remain the property of the State of Louisiana, except as otherwise provided * * *." And Sections 3 of those Acts provide: "That the Conservation Commission of Louisiana shall have the power to lease any and all water bottoms and natural reefs as described in Section 1, of this act. No claims to any water bottoms by any person, firm or corporation, shall be valid or have any effect until adjudicated by a court of competent jurisdiction between the State and claimant, and said claimant shall by virtue hereof have a right of action against the State in any court of competent jurisdiction for the legal determination of the validity of his claim." In a subsequent re-enacting statute (1932) the effect of the judgment to be rendered in the action was limited to an adjudication of the question of title.
Particularly alluding to the quoted provisions the State, to quote from the brief of its counsel, argues: "In the instant case we are faced with some apparent conflict between the provisions of a general law relating to the prescription of actions of nullity of patent and a special comprehensive law covering the whole subject of title to and the administration of the use of bodies of water bordering the Gulf of Mexico, and we submit that here the Court must find that the provisions of the special statutes, herein referred to as the Oyster Statutes, are not repealed by the general prescriptive statute, Act No. 62 of 1912, and that the provisions of the Oyster Statutes that the beds of the bodies of water of the particular class dealt with shall be, continue and remain the property of the State of Louisiana create an exception to Act No. 62 of 1912 in that the prescription does not apply to an invalid grant purporting to cover beds of a bay of the Gulf of Mexico, insofar as that grant may be said to cover such body.

* * * * * *
"* * * The legislative expression of intention that such property should be, continue and remain the property of the State of Louisiana is irreconcilable with a construction of the prescriptive statute as barring, after a period of six years, any questions as to the validity of a prior invalid grant of such property. To so construe Act 62 of 1912 would imply a repeal *7 of the prior specific act. * * *" This argument respecting the creation of an exception is predicated on an assumption, as is noticed, that there is a conflict between the provisions of the Oyster Statutes and those of the Act of 1912; but we observe none. The recital that the described water bottoms "* * * shall be, continue and remain the property of the State of Louisiana", which is principally relied on by counsel, has reference only to such bottoms as have not been conveyed by the State theretofore to private parties; and to them, obviously, the 1912 Act cannot have any application. If this were not true, and the recital be construed as referring also to previously disposed of property, it would be subject to a constitutional attack as divesting vested rights.
Nevertheless, all of the mentioned Oyster Statutes recognize that there might be title claims outstanding under attempted sales or grants by the State, and, with reference thereto, provision is made in Sections 3 of the 1910, 1914, and subsequent Acts for a judicial determination of those claims. And in a proceeding thus contemplated a claim, predicated on an unauthorized patent such as is involved herein, might well be decreed valid and effective as a result of the prescription of the 1912 statute, all of which tends to show that the suggested conflict does not exist.
Incidentally, another Act of 1910, being No. 258, likewise contained a declaration as to the State's ownership of water bottoms, subject, however, to alienations to private parties theretofore made. As said in State v. Board of Commissioners of Caddo Levee District, 188 La. 1, 175 So. 678, 681, "Act No. 258 of 1910 by its terms clearly manifests the legislative intention to establish a uniform and mandatory rule or system as to the ownership of the waters and beds of the bayous, lagoons, lakes, rivers, and bays within the State, where they were not under the direct ownership of any private person, firm, or corporation, and where they had not been previously transferred by the State. * * *" See also footnote to Humble Oil & Refining Co. v. State Mineral Board, supra.
We conclude, therefore, that John Beckwith's patent of 1874, regular on its face and properly recorded, was tacitly confirmed and rendered unassailable by the inaction of the State and the provisions of Act No. 62 of 1912.
Under its alternative claim of derivative title, by supplemental answers the State avers that the lands in dispute herein were adjudicated to it in 1883, for unpaid taxes due by John Beckwith for the years 1881 and 1882, and that they have not been redeemed. The bed of Grand Bay, with which we are only concerned, is in Sections 17, 19, 20 and 22, Township 19 South, Range 18 East, according to the Polk survey (on which the Beckwith patent was based) as reaffirmed and reestablished by the DeArmas survey approved in 1939. However, the tax deed of 1883 (incidentally, it was cancelled subsequently by authorized State officials), as well as the supporting assessment roll of 1882, does not list any of those sections; rather it designates the property sought to be adjudicated therein by other section numbers without reference to any particular plat or survey.
In an effort to show that the lands on which the wells are located were included in the tax sale the State offered the testimony of a Mr. Haynes, engineer for the Department of Public Works, who had drawn a composite map depicting several surveys consummated previous to the one of Polk and who sought to identify the property by those former surveys, notwithstanding that he never went on or near the lands. Assuming for the sake of argument that use of the older surveys was legally proper (there is no suggestion in the deed or tax roll whatever that the lands were to be located in relation to them, rather than to the then existing official plat which had been accepted and approved by the Register's office some nine years earlier), we cannot say that the attempted identification was satisfactory and sufficiently established, particularly in view of certain admissions of the witness. For example, he testified:
"Q. But the prior surveys about which you have testified in making up *8 this plat, which were prior to the Polk Survey, I take it, you did find many discrepancies, did you not? A. Yes, I did.
"Q. You found that in order to make up your composite picture, you had to disagree with Mr. DeArmas' map of 1939? A. I had to disagree with everybody."
Moreover, Mr. Haynes admitted that where land is patented according to the Polk survey and thereafter the patentee conveys it, the deed describing the section numbers without reference to any particular survey, such land should be located according to the Polk plat.
Finally, and again in the alternative, the State contends that the rights of the Beckwith group have been lost as the result of various prescriptions.
It says that since long before 1904 Grand Bay has been continuously and regularly under the supervision and control of the State, through various agencies thereof, and that its numerous acts respecting fishing, oyster planting and harvesting, navigating and patrolling of the waters, and geophysical operations, support the prescription of 30 years acquirendi causa. The plea cannot be sustained. If for no other reason the evidence adduced is very vague, indefinite, and unsatisfactory respecting the mentioned acts and, therefore, it does not preponderately disclose the adverse possession requisite under LSA-Civil Code, Article 3500.
It is next said that the claim became barred in 10 and 30 years, since Act No. 189 of 1910 (an Oyster Statute which was reenacted in 1914 and 1932) made necessary the assertion of a private claim judicially and the general law, LSA-Civil Code, Articles 3544 and 3548, sets limits of 10 years for a personal action and 30 years for an action to recover an immovable. The mentioned statute, of course, provided no prescriptive period; and it is obvious that the mentioned 10-year prescription is inapplicable. Neither could the 30-year liberative prescription apply in view of the State's failure to establish, as above shown, the required adverse possession. See Labarre v. Rateau, 210 La. 34, 26 So.2d 279.
The last prescription pleaded is that of 10 years based on nonuser. The State theorizes that the claim of the Beckwith group amounts to no more than a mineral servitude in and to the bed of Grand Bay, since by an admission the property is subject to paramount rights of the State to the use of the waters for the regulation of fisheries, commerce and navigation, and, as a consequence, they have only the right to take oil and gas therefrom. We are not impressed with the theory. In numerous instances parcels of land are burdened with rights of passage and other kinds of uses and servitudes without otherwise impairing or affecting the ownership thereof.
While allegations are contained in the pleadings as to the names of the heirs and successors of John Beckwith and also as to the kinds and amounts of their various interests in and to the bed of Grand Bay, and some supporting evidence was furnished, the record appears inadequate to permit our pronouncing definitively with respect thereto. Therefore, the cause will be remanded for a determination of those matters and for the fixing of the proportion of the deposited royalities from the producing wells to which each such claimant is entitled.
For the reasons assigned the judgment of the district court in favor of the State of Louisiana, its agents and officials, is reversed and set aside, and there is now judgment in favor of the heirs and successors of John Beckwith (the Beckwith group) recognizing them to be the owners of the funds on deposit in the Registry of the Court, as well as of all additional funds that may hereafter be deposited, representing the one-eight royalties due under the provisions of the lease described in Article 1 of the original petition of plaintiff, the California Company, and attributable to the production from the eight wells situated in the bed of Grand Bay, in Plaquemines Parish, Louisiana, and involved in this cause. Further, it is decreed *9 that plaintiff, the California Company, be and it is hereby authorized to continue to deposit the funds from the sources above designated into the Registry of the Court until such time as this judgment shall become final and executory, and it is relieved of all liability for the payment of the funds now or hereafter deposited herein from the sources above designated. Also, it is ordered that the cause be remanded to the district court for further proceedings, according to law and consistent with the views herein expressed. All costs of this suit shall be paid out of the funds deposited.

On Rehearing
McCALEB, Justice.
We granted a rehearing in this case for the purpose of considering the contention of the State that our holding is in direct conflict with the decision in Miami Corporation v. State, 186 La. 784, 173 So. 315.
The facts and issues presented in the case have been fully and comprehensively outlined, considered and adjudicated in our original opinion. Hence, another detailed statement would be superfluous. Suffice it to repeat that this concursus proceeding involves the legal title to a portion of the bed of Grand Bay in Plaquemines Parish, located in Sections 17, 19, 20 and 22, T. 9 S., R. 18 E., wherein eight producing oil wells are situated. The private claimants, known as the Beckwith Group, are the holders of a patent covering the disputed area, which was issued by the State in 1874 to their ancestor in title, John Beckwith. But the State maintains, among other things, that this patent is invalid as to that part embracing the bed of Grand Bay, a navigable body of salt water connecting with the Gulf of Mexico, forasmuch as the bottoms of navigable waters are common or public things and are not susceptible of private ownership.
In our original opinion, we concluded that this contention of the State was of no avail in view of Act No. 62 of 1912, which effectively barred all proceedings by it or anyone else to vacate or annul any patent issued by the State, when the patent was duly signed by the Governor and Register of the State Land Office and of record in the State Land Office, unless brought within six years from the passage of the statute, with respect to patents issued previous thereto. This resolution was based on the previous rulings of this court in State v. Sweet Lake Land & Oil Co., 1927, 164 La. 240, 113 So. 333; Realty Operators v. State Mineral Board, 1942, 202 La. 398, 12 So.2d 198; O'Brien v. State Mineral Board, 1945, 209 La. 266, 24 So.2d 470 and Humble Oil & Refining Co. v. State Mineral Board, 1953, 223 La. 47, 64 So.2d 839.
Counsel for the State vigorously assail our decision, and some of the cases on which the ruling is predicated, professing that it does violence to and overrules by indirection Miami Corporation v. State, supra.
The question for decision in the Miami case, which was an action of boundary brought by a littoral owner of property extending to the shore line of Grand Lake, situated in Cameron Parish, was whether such owner would retain title to the eroded area of the abutting land which had become inundated by the encroachment of the lake upon the private property. In concluding that the abutting owner would lose to the State all of the land which had become submerged and formed part of the bed of the lake, the court deduced that it was contrary to the policy established by the articles of the Civil Code, dealing with common and public things, to sanction the holding by individuals or corporations of any part of the bed of a navigable lake, bay, river or stream and that this type of property was not susceptible of private ownership.
The practical effect of the opinion in the Miami case, which specifically overruled the divergent view announced five years before, 1931, in State v. Erwin, 173 La. 507, 138, So. 84, was to necessarily extend the provisions of Articles 509 and 510 of the LSA-Civil Code, which deal with the right of accession of owners of the soil situated on the edge or bank of a river or stream, so as to include other navigable bodies of *10 water insofar as the right of accession by the State is concerned.[1] However, the decision is not pitched on the ground that the doctrine of accession by erosion is the governing factor but, as aforesaid, is predicated on the premise that it is contrary to the policy of the civil law to allow private individuals or corporations to hold navigable water bottoms and that Articles 450 and 453 of the LSA-Civil Code render such property insusceptible of private ownership.
While we take no issue with the pronouncement of the court, that it is inimical to the policy of our Civil Code to permit private ownership of the beds of navigable waters, the deduction that this policy is founded upon the insusceptibility of private ownership of water bottoms, is not wholly accurate. If, by the use of the word "insusceptible", the court had in mind that navigable water bottoms or beds are incapable of private ownership, then we must respectfully disagree with that concept for, as pointed out in our original opinion, the court has acknowledged, on at least two other occasions, in State v. Richardson, 140 La. 329, 72 So. 984 and State v. Bayou Johnson Oyster Co. Limited, 130 La. 604, 58 So. 405, 410, that water bottoms, whether navigable or non-navigable, are lands not only susceptible of private ownership but, as stated in the Bayou Johnson Oyster Co. case, that "* * * there is no legal impediment in the way of the state's alienating such property in favor of particular individuals or corporations, * * *".[2] Nor do Articles 450 and 453 of the LSA-Civil Code, which were cited by the court in the Miami case as authority for its conclusion that navigable water bottoms are insusceptible of private ownership, sustain such a view.[3]
Article 450 of the LSA-Civil Code defines common things as those things "the ownership of which belongs to nobody in particular, and which all men may freely use, conformably with the use for which nature has intended them; such as air, running water, the sea and its shores". Surely, the bottom of a stream, bay or lake is not within the same category as air, running water or the ever changing seashore and it cannot rightfully be classified to be incapable of private ownership and use merely because it is covered by water. To say that, because it is submerged, makes the difference between susceptibility or insusceptibility, would be contrary to basic principles of law recognizing the ownership in private individuals to the beds of non-navigable lakes, etc., which are also covered by water.
Article 453 of the Code, also cited in the Miami case, deals with public things, that is, those things which are not necessarily insusceptible of private ownership but which, because of their nature, are committed to public use exclusively.[4]
The important article of the Code, relative to the susceptibility of ownership of things, is Article 482 which provides that there are things which are not susceptible of private ownership and can never become the object of it "as things in common, of *11 which all men have the enjoyment and use". The second paragraph of the Article states that there are things which, although naturally susceptible of ownership, "may lose this quality in consequence of their being applied to some public purpose, incompatible with private ownership; but which resume this quality as soon as they cease to be applied to that purpose; such as the high roads, streets and public places."
It seems to us that, if the bottoms of navigable lakes and bays can be included in Article 482, they fall within the class delineated in the second paragraph thereof for, whereas they are by their nature susceptible or capable of private ownership, their full enjoyment may be said to be somewhat impaired by reason of the superior rights of the government and the public to the unhampered use of the water above them for navigation, commerce, fishing and the like. Hence, as stated in the Miami decision, the bottoms or beds of navigable waters are public things within the contemplation of our Civil Code and it is contrary to the policy expressed therein to permit private interests to own them. This is what the case stands for, and no more.
Let us then consider whether that doctrine has been abrogated by the decision in the instant matter. At the outset, the State contends on this rehearing that the facts of the case bring it squarely within the rule enunciated in the Miami case as there was some evidence submitted at the trial to support a finding that the submerged area where the eight well sites are located, which is presently covered by the navigable waters of Grand Bay, were swamp and overflowed lands in 1874 when the Beckwith patent was granted and that the probabilities are that this area gradually eroded and became submerged by the waters of the Bay. Accordingly, counsel say that, if this be so, it should be held that the Beckwith patent embracing the land now submerged, although originally valid, has been lost to the Beckwith group by erosion.
This proposition is not impressive. Initially, it is to be observed that the contention, raised for the first time on rehearing, constitutes a complete reversal by the State of the position which it has previously adopted. That position was, as shown by the State's answer to the concursus proceeding, that the patent issued to Beckwith in 1874 was invalid, as to the area upon which the eight well sites are located, because the submerged land which forms part of the bed of the navigable salt water bay (Grand Bay) was acquired by the State in 1812 in its sovereign capacity. Moreover, the evidence to which the State adverts as proof of the gradual conversion of the area from swamp lands in 1874 to navigable water bottoms at the present time, is highly speculative and not convincing.
We therefore pass on to a reconsideration of the main contention of the State, viz.: that the Beckwith patent was invalid when issued in 1874, insofar as it purported to convey title to that part of the bed and bottom of Grand Bay where the well sites are located, because of the State's acquired ownership of these submerged lands as sovereign at the time of its admission to the Union in 1812. In assailing the patent, counsel for the State claim that the Governor and Register of the State Land Office were without authority to include in the conveyance those submerged lands. However, they acknowledge, as indeed they must, that the Legislature had the right to sanction the conveyance of such lands, notwithstanding any codal concept of public policy to the contrary, as there was no constitutional restraint on the power of the Legislature to dispose of the navigable water bottoms of the State prior to the adoption of the Constitution of 1921. Barnett v. State Mineral Board, 193 La. 1055, 192 So. 701; Standard Oil Co. v. Allison, 196 La. 838, 200 So. 273 and Realty Operators v. State Mineral Board, supra. Hence, it follows that, inasmuch as the Legislature had the right to authorize the issuance of a patent to the submerged lands, it was likewise empowered to subsequently ratify the action of the Governor and Register of the *12 State Land Office in granting such a patent. And this, we found in our original opinion, is exactly what the Legislature did by the enactment of Act No. 62 of 1912.
Nevertheless, counsel for the State insist that our resolution is erroneous and that it is contrary to the decision in the Miami case.
Since counsel admit the right of the Legislature to ratify and validate conveyances of this sort by State Officers, we find it difficult to perceive at the outset, how our original opinion and the views in the Sweet Lake, Realty Operators, O'Brien and Duck Lake cases do violence to the Miami decision or in any wise conflict therewith, as that case did not involve the right of the State to assail a confirmatory title to submerged property issued under authority of the Legislature. Indeed, our decision herein and the cases preceding it are founded on an entirely different principle of law from that upon which the Miami case is buttressed.
But, say counsel, the court was wrong in this and its other opinions in concluding that the Legislature, in enacting Act No. 62 of 1912, ever intended to ratify or confirm titles to the beds of navigable waters contrary to the policies announced in the Civil Code.
Thus, the contention is not in reality that the court has rendered a decision contrary to the Miami case but rather that, in view of that pronouncement and the articles of the Civil Code on the subject, the court should have interpreted Act No. 62 of 1912 so as to exclude from its terms any patents which might embrace the beds or bottoms of navigable bays and lakes.
Let us see then whether such an interpretation as counsel for the State would give to Act No. 62 of 1912 is admissible. The substance of their lengthy argument is that, in view of the Miami case, the Articles of the Civil Code, the Oyster Statutes, Acts Nos. 106 of 1886; 52 of 1904; 189 of 1910; 54 of 1914; 139 of 1924; 67 of 1932, LSA-R.S. 56:421 et seq., and Act No. 258 of 1910, which are all declaratory of the public policy of the State with reference to its ownership of the waters and beds of navigable bays, lakes and rivers, Act No. 62 of 1912 should be construed so as to except from its provisions any patents issued which cover the bottoms of any navigable waters.
Act No. 62 of 1912, which is quoted in full in our original opinion, provides "* * * That all suits or proceedings of the State * * * to vacate and annul any patent issued by the State * * * duly signed by the Governor of the State and the Register of the State Land Office, and of record in the State Land Office * * * shall be brought within six years * * *". (Italics ours.) Thus, the statute, by its explicit and unequivocal terms, bars all suits to annual any patent, irrespective of whether the patent covers high land or submerged land.
Applicable, here, is that fundamental canon of statutory construction set forth in Article 13 of the LSA-Civil Code that, when a law is clear and free from all ambiguity, "the letter of it is not to be disregarded, under the pretext of pursuing its spirit".
But further than this, by delving into the spirit which prompted the passage of Act No. 62 of 1912, we experience no difficulty whatever in deducing that the Legislature intended that the Act was to be allinclusive, in conformity with the language used therein. It takes no more than an examination of the various Oyster Statutes to make it evident that the Legislature of 1912 was intimately acquainted with the public policy of the State to retain title to all navigable water bottoms. This fact is made even more apparent by a reading of Act No. 258 of 1910, which was a general law reaffirming the State's ownership of bayous, lagoons, lakes, bays, rivers and the beds thereof. See State v. Board of Com'rs of Caddo Levee District, 188 La. 1, 175 So. 678. Section 2 of that statute, which pertains exclusively to navigable waters, contains a proviso that the law "* * * is not intended to interfere with the acquisition in good faith of any *13 waters or the beds thereof transferred by the State or its agencies prior to the passage of this Act; * * *". Accordingly, it is only reasonable to conclude that the Legislature, in enacting Act No. 62 of 1912, evinced, as part of its general overall purpose, the design of confirming these titles to navigable water bottoms, the existence of which was recognized in Act No. 258 of 1910, provided their validity was not contested within the prescribed six-year period.
Since it is plain, as above shown, that the Legislature of 1912 was well aware of the policy of the State to retain title to all navigable water bottoms (this fact being admitted by counsel for the State), we think it manifest that it employed the broad language and sweeping terms contained in Act No. 62 of 1912 deliberately, so that all doubts respecting the validity of any patent previously issued, in the form prescribed by the statute, would be set at rest, if the transfer was not assailed within the six-year period. Albeit, if the Legislature had the intention of excluding patents covering navigable water bottoms from the effect of the law, it would have been a very easy matter to have done so by an appropriate exception.
In the first case in which Act No. 62 of 1912 was pleaded as a bar to an action assailing a patent, Atchafalaya Land Co. v. F. B. Williams Cypress Co., 146 La. 1047, 84 So. 351, 358, decided in 1920, its provisions were unsuccessfully attacked on various grounds of alleged unconstitutionality. There, counsel for the plaintiff additionally argued that the patents were absolutely null and, similar to the contention of the State here, asserted that they were "* * * not susceptible of confirmation by a statute of repose, because the officers who signed and issued them were without authority to do so, * * *". But the court answered that, since the patents were in the form described by the statute, it mattered not that the Governor and the Register of the State Land Office were without authority to issue them as "* * * the Legislature had authority to ratify and confirm their acts, as was done by the statute of repose".
In the next case, that of Atchafalaya Land Co. v. Dibert, Stark & Brown Cypress Co., 157 La. 689, 102 So. 871, decided in 1925, the opinion of the court in Atchafalaya Land Co. v. F. B. Williams Cypress Co. supra, upholding Act No. 62 of 1912, was assailed as unsound but the court, after a reconsideration of the entire matter, affirmed its former view that the statute was one of repose and applicable to patents which were invalid, provided they were in the prescribed form.
The next case was the Sweet Lake case, supra, decided in 1927. There, the court found the statute to be applicable to all submerged lands, whether covered by navigable water or not.[5] Similar rulings were made in the Realty Operators case in 1942, the O'Brien case in 1945 and the Duck Lake case last year.
Yet, in the face of all of these decisions, and the circumstance that the Legislature has met many times since the first ones were rendered and apparently approved the interpretation given the statute by the court, by its failure to enact an amendatory law, counsel for the State would have us at this late date reverse our opinions, overrule the jurisprudence and hold that the Legislature, in 1912, did not mean what it said, when it provided that all patents theretofore issued would become unassailable within six years after the passage of the act, and that, in reality, it intended to except from its provisions patents to navigable water bottoms because transfer of that sort of property was contrary to the policy stated in the Civil Code which was *14 recognized and enforced in the Miami decision.
This we will not and should not do. The manifest purpose of Act No. 62 of 1912 was to stabilize titles issued by the State over the signature of the Governor and Register of the State Land Office in cases wherein the State and other interested parties failed to contest the patents within a stated time. Thus, primarily, the act invited attacks on unauthorized patents and did not effect immediate confirmation, as ample time, six years, was given to proceed. But, as we have heretofore said, when the stated time elapsed without action, the curative provisions of the law became operative and rendered all such patents unassailable.
The argument of the State in this case is identical in principle with that of the tax debtor in our recent decision in King v. Moresi, 223 La. 54, 64 So.2d 841. There, the property had been sold for nonpayment of taxes to the wife of the Sheriff of the Parish, in direct violation of a prohibitory law, Act No. 94 of 1902, LSA-R.S. 47:2194, making it unlawful for any Sheriff or Tax Collector to buy either directly or indirectly any property offered for sale for taxes. The tax debtor sought to have the sale set aside on the ground that the transaction was void, ab initio, being contrary to public policy. But the court rejected this contention and sustained a plea of the five-year constitutional peremption interposed by the defendant, stating that the language of the Constitution was very broad and applied to all tax sales except those specifically excepted therein.
For these reasons and those set forth in our original opinion, it is ordered that that opinion and decree be and it is reinstated as the final judgment in this case.
LE BLANC, J., files concurring reasons.
FOURNET, C. J., and PONDER and HAWTHORNE, JJ., dissent and assign written reasons.
LE BLANC, Justice (concurring).
I agreed to a reconsideration of this case because of the importance of the issues that are presented. Their importance is in no manner better reflected than in the fact that the issues have been thoroughly reviewed in the opinion on rehearing notwithstanding the careful consideration that had been given to them in the original opinion. Then too, their importance is shown by the fact that they evoked such a comprehensive research of the law and the jurisprudence as is found in the dissenting opinion of one of the Justices.
I stated at the time the application for rehearing was granted that I thought the paramount question that was involved in the case was the applicability of the provisions of Act No. 62 of 1912. I still think that that is the determining factor and am concerned with the nature and character of property as defined in the Civil Code only to the extent by which the patent to the particular tract of land involved in this case is affected by the statute in question.
In my opinion, the statute does not repeal, either by implication or otherwise, any of the Articles of the Civil Code relating to the susceptibility or non-susceptibility of private ownership any more than it repeals or attempts to repeal any other law or statute respecting the right, vel non, of the State or any of its officers to transfer property. All that the statute did was to provide a time within which claims or disputes arising out of any patents granted by the State and duly signed by the Governor and the Register of the Land Office and of record in the land office, or any transfer of property by any subdivision of the State, should be brought to issue, decided and quieted in the public interest. And in this connection, no exceptions were made with regard to the nature, character and kind of any property. The act specifically states that "all" suits or proceedings to vacate or annul "any" patent, "shall" be brought with the time limit fixed therein and I entertain but little doubt that had the State instituted a suit or a proceeding against the proper parties urging the same *15 contentions it now makes within six years from the passage of the act, as therein provided, the patent involved in this case would have been annulled. Not having exercised its right to do so it must abide the consequences.
Much is said about the public policy of the State as embodied in the Articles of the Civil Code and in the jurisprudence with respect to its sovereign power in dealing with lands that either belong to it or to the people in common. I believe that the Act of 1912 also enunciated a species of public policy regarding such lands and that policy was to put at rest all doubt involved in their transfer to private parties regardless of whether the transfer had been made with or without proper authority.
I might mention here, for it has not been mentioned before, that Act No. 62 of 1912 was considered on the question of its constitutionality, by the Supreme Court of the United States in the case of Atchafalaya Land Co. v. F. B. Williams Cypress Co., Ltd., which went to that Court on certiorari. See 258 U.S. 190, 42 S.Ct. 284, 286, 66 L.Ed. 559. The concluding paragraph of the opinion expresses my view of its nature, purpose and intent far better than I can state. I here quote it:
"The Act of prescription was a proper exercise of sovereignty. The state could recognize, as it did recognize, that there might be claims derived from it, asserted or to be asserted, rightfully or wrongfully, involving conflicts which should be decided and quieted in the public interest, and therefore, enacted the statute. And such is the rationale of statutes of limitations. They do not necessarily lessen rights of property or impair the obligation of contracts. Their requirement is that the rights and obligations be asserted within a prescribed time. If that be adequate, the requirement is legal, and its justice and wisdom have the testimony of the practices of the world."
For these reasons I concur in the majority opinion.
FOURNET, Chief Justice (dissenting).
After carefully studying the views expressed in the majority opinion and the two dissenting opinions, as well as the several authorities therein cited, I am convinced the holding in the majority does violence to the basic and fundamental principles upon which the holding in the comparatively recent decision of Miami Corporation v. State, 186 La. 784, 173 So. 315, is predicated, that is, that the title to the bottoms of navigable beds of water, and particularly those that form a part or an arm of the sea, are insusceptible of private ownership, i. e., cannot be owned by private individuals; and, therefore, the majority ruling in effect overrules the holding in the Miami case that when land bordering such streams becomes submerged under the waters thereof and, as a result, forms a part of its bed, the owner is divested of his title thereto and it thereupon becomes vested in the state for the benefit of and in trust for the people as a whole.
Viewed in the light of this public policy that is established by codal articles that have been interpreted and reaffirmed in an unbroken line of jurisprudence for more than a centuryand which is also reflective of a rule that is firmly grounded in the law and jurisprudence universally obtaining in all of the statesI have no doubt that if this were an original test[1] of legislative intent in adopting Act No. 62 of 1912, the statute could, despite its all-embracive language, very easily be construed to mean that the legislature did not intend thereby to include within its purview the beds of navigable streams, and particularly those connected with or forming a part of *16 or being an arm of the sea, but only such lands as the state would, in the ordinary course of events, have available for sale on the open market. In my opinion, such a construction is logical and sound, leading to no absurd consequences.
However, even conceding the majority is justified in giving to the act a literal interpretation, as it is here doing, the act, by its plain language, does no more than bar the state from testing, after six years, the validity of a patent within its scope, and the state's failure to exercise this right within the prescribed time has the effect of curing the defects that might have existed in the patent, as such. Of necessity, therefore, under the holding in the Miami case, as well as all previous and subsequent jurisprudence, with the single exception of the Duck Lake case, a patent that includes within its description land that lies under arms of the sea or other navigable streams is, as to that land, nonexistent, for such land cannot be owned by private individuals and is, instead, vested in the state in trust for all the people, by virtue of its inherent sovereignty. As such, a patent to it is equivalent to a patent to air, or to the water running through the Mississippi river on its way to the sea. An arm of the sea is one of those things which all men may freely use conformable with the use for which it is intended by nature, Article 450 of the LSA-Civil Code, and is among those things that are insusceptible of private ownership. Article 482.
Clearly, if one holding under a valid patent which gives him full or perfect ownership of the land in its entirety, and, as such, entitles him to hold that property to the exclusion of all other persons, Article 488 of the LSA-Civil Code, including all that is directly above as well as beneath it, Article 505, loses his title to that part of the property that becomes submerged under navigable water, as was held in the Miami case, then one who holds under an invalid patent certainly has no greater rights merely because his invalid patent has been cured by the peremption provided by Act No. 62 of 1912.
There can be no question but that Beckwith himself was aware of this well-established public policy with respect to the beds of navigable streams, for when he took possession of the property described in his patent, he excluded the portion covered by the waters of the sea in placing his property on the assessment roll. I am satisfied that the California Company also took cognizance of this public policy, for it was not satisfied with a lease from the so-called Beckwith group alone, securing, in addition, a lease from the state as to that portion forming a part of the bed of Grand Bay. I am most confident, too, that but for the discovery of oil, this issue would never have been raised, as the record reveals this property was adjudicated to the state for the unpaid taxes of 1883 and that it remained in the state until cancelled some 63 years later by the Registrar of the State Land Office on the affidavit of Price, after oil development in the vicinity.
I recommended that the case be reargued to clarify the entire matter, but not having prevailed in my request, and because of the importance and far-reaching effect of this decision on the property that is inherently vested in the state in its sovereign capacity, which will create a most impossible situation that can but lead to confusion and disorder where it will be impossible to delineate the rights of an individual under full ownership and the rights of the people in general under the established public policy of the state, I respectfully dissent.
PONDER, Justice (dissenting).
I cannot agree with the majority opinion for the reason that undue significance is given to Act No. 62 of 1912. This act merely provides that suits to annul patents must be brought within six years. There is nothing in the act to indicate any intention on the part of the legislature to modify or repeal the articles of our civil code declaring that an arm of the sea is insusceptible of ownership and I know of no rule of statutory construction which would give it that effect either by implication *17 or otherwise. I believe a reasonable construction of the statute would be that it only applies to property susceptible of ownership and that it has no application to property that cannot be owned. Furthermore, the act is a curative statute and cannot be given the effect of supplying title to the arm of the sea when the patent itself did not and could not convey any semblance of title to it. The arm of the sea is insusceptible of ownership and cannot be conveyed or owned. The effect given this act in the majority opinion is tantamount to the conveyance of the arm of the sea for the reason that the patent could not and did not convey any semblance of title to it.
I am aware that there is a conflict in the jurisprudence of this state but the better rule is pointed out in the dissenting opinion of Justice HAWTHORNE and it is supported by the preponderance of authority. In the case of Miami Corporation v. State, 186 La. 784, 173 So. 315, wherein the plaintiff had a valid title to land which subsequently became, by erosion, a part of a navigable body of water, this Court held that, irrespective of the valid title, the moment the land became a part of the navigable body of water that it was insusceptible of ownership. I am of the opinion that the ruling in that case was sound and in conformity with the basic law of our state and that the arm of the sea involved in the case now under consideration is insusceptible of ownership.
Since the effect to be given Act No. 62 of 1912 is a determining issue in this case I wish to emphasize that the patent, purporting to convey the arm of the sea when the law itself says that it cannot be owned, conveyed nothing, not even the shadow of a title, and the necessity for its annulment is immaterial for the reason that Act No. 62 of 1912 cannot be used as a vehicle of conveyance to supply title when not even a color of title existed.
For the reasons assigned, I respectfully dissent.
HAWTHORNE, Justice (dissenting).
If one will examine a map of the State of Louisiana, he will find off the southeast coast of the Parish of Plaquemines an arm of the sea bearing the name of Grand Bay. In this bay there were located at the time this suit was tried eight producing oil wells. The ownership of the accumulated oil royalty from these wells, amounting to many thousands of dollars, has provoked this concursus proceeding, instituted by The California Company. The claimants are the State of Louisiana on one side and a large group of individuals on the other who derive their title from one John Beckwith.
Grand Bay is conceded to be, and in fact it is, a navigable arm of the sea and was found by this court on original hearing to be such when the State of Louisiana was admitted into the Union in 1812. In 1874 a patent was issued to John Beckwith that covers and includes that portion of Grand Bay in which the eight producing wells are located. The individuals who derive their title from Beckwith claim that he acquired title to that portion of Grand Bay under and by virtue of this patent, as against the State which contends that this patent insofar as it may apply to Grand Bay is null and void, and which claims title by virtue of its inherent sovereignty.
The case therefore presents for determination the question: Is Grand Bay, a navigable arm of the sea, susceptible of private ownership?
If the answer to this question is in the affirmative, the bed of the Mississippi River, Lake Pontchartrain, the Port of New Orleans, and even portions of the Gulf of Mexico itself, owned by the State in 1812 by virtue of its sovereignty, are likewise susceptible of private ownership, provided the State, prior to the Constitution of 1921, issued through error, mistake, or otherwise a patent thereto.[1]
*18 The State argues in the alternative that, if Grand Bay is susceptible of private ownership, the lands on which the producing wells are located are owned by it by virtue of an adjudication to the State in 1883 for the unpaid taxes for the years 1881 and 1882 under an assessment in the name of John Beckwith. For 63 years no assessment was made of the property and no taxes were paid thereon, and the possession was in the State and the property was under the control and supervision of the State for all that time. It was not until 1946, 63 years after the adjudication, that Isaac R. Price acting for the Beckwith group executed an affidavit to the Register of the State Land Office and secured the cancellation of the tax adjudication. The State contends that the purported cancellation of the tax adjudication was null and void, and that consequently under the tax adjudication made to it in 1883 the title remains in the State. The Beckwith group, however, argue that the tax adjudication was void for want of definite description. If Grand Bay, a navigable arm of the sea, is susceptible of private ownership, there would seem to be considerable merit in the State's alternative plea. However, in my opinion the bed of Grand Bay is insusceptible of private ownership, and consequently there is no reason for discussing this alternative plea.
Ever since Louisiana has been a state of the Union, it has been a rule of public policy and of title that the State of Louisiana as a sovereign holds title at all times to navigable arms of the sea, as they are insusceptible of private ownership. Moreover, private ownership of a navigable arm of the sea is expressly prohibited by the articles of the Civil Code. Article 482 provides:
"Art. 482. Among those [things] which are not susceptible of ownership, there are some which can never become the object of it; as things in common, of which all men have the enjoyment and use.
"There are things, on the contrary, which, though naturally susceptible of ownership, may lose this quality in consequence of their being applied to some public purpose, incompatible with private ownership; but which resume this quality as soon as they cease to be applied to that purpose; such as the high roads, streets and public places."
Articles 450, 451, and 453 read:
"Art. 450. Things, which are common, are those the ownership of which belongs to nobody in particular, and which all men may freely use, conformably with the use for which nature has intended them; such as air, running water, the sea and its shores." (All italics mine.)
"Art. 451. Sea shore is that space of land, over which the waters of the sea spread in the highest water, during the winter season."
"Art. 453. Public things are those, the property of which is vested in a whole nation, and the use of which is allowed to all the members of the nation: of this kind are navigable rivers, seaports, roadsteads and harbors, highways and the beds of rivers, as long as the same are covered with water.
"Hence it follows that every man has a right freely to fish in the rivers, ports, roadsteads, and harbors."
These articles, which were a recognition of principles fundamental in the civil law, were first found in our law in the Civil Code of 1808 and were carried forward into the Civil Codes of 1825 and 1870, and particularly establish the public policy of this State, and no principles could be more deeply embedded in our law. They are clear and permit of no construction other than that common and public things, while dedicated to public use, are for the use of all of the people and can be owned by no one. These articles have been uniformly construed in the jurisprudence of *19 this State, and among the cases holding that a navigable arm of the Gulf, such as that with which we are here dealing, is a common thing owned by the State in its sovereign capacity and insusceptible of private ownership are Milne v. Girodeau, 12 La. 324; Zeller v. Southern Yacht Club, 34 La.Ann. 837; Burns v. Crescent Gun & Rod Club, 116 La. 1038, 41 So. 249; Louisiana Navigation Co., Ltd. v. Oyster Commission of Louisiana, 125 La. 740, 51 So. 706; State v. Bayou Johnson Oyster Co., 130 La. 604, 58 So. 405.
In Louisiana Navigation Co. v. Oyster Commission, supra, plaintiff was asserting title under a patent issued by the State to certain submerged lands which formed part of the bed of Mississippi Sound and the Gulf of Mexico, and particularly the bed of Creole Pass and Grand Pass off the coast of St. Bernard Parish. In dismissing the suit on exception of no cause of action this court, after quoting Article 453 of the Civil Code, said [125 La. 740, 51 So. 711]:
"Hence, there can be no such thing in this state as private ownership of the bed of a navigable river, and a fortiori can there be no such thing as private ownership of the bed of the sea or of an arm of the sea. In a case decided many years ago, this court (referring to certain land lying beneath the waters of Lake Ponchartrain and claimed by the plaintiff) said: `It appears to us that the testimony shows fully the ground in question lies much below high-water mark and forms part of the bed of the lake [arm of the sea], and is not, therefore, susceptible to private ownership.' Milne v. Girodeau, 12 La. [324] 325. And, to the same effect, was the decision in Zeller v. Yacht Club, 34 La.Ann. 837. * * *"
The court further said:
"We conclude, then, that the grants under which plaintiff claimsbeing of land bordering upon, and partially surrounded by, the tide water of the Gulf of Mexicocarry its titles no farther than high-water mark, and that, in so far as it (plaintiff) asserts ownership and possession, under such titles, of land lying beneath the waters which surround the tracts of dry land included in said grants, or, lying beneath any navigable passes, or channels, which intersect such tracts or separate them from each other, the exception, of no cause of action, was properly maintained. * * *"
In the famous case of Miami Corporation v. State, 186 La. 784, 173 So. 315, 322, the State was claiming title to a portion of the bed of Grand Lake in Cameron Parish by virtue of its inherent right of sovereignty and contending that it was not susceptible of private ownership. In that case the court had occasion to consider Articles 450 and 453 of the Civil Code and cited numerous cases in our jurisprudence interpreting and applying these two articles. In the course of the opinion the court said:
"* * * It appears to be the rule that where the forces of naturesubsidence and erosionhave operated on the banks of a navigable body of water, regardless of whether it be a body of fresh water or the sea, or an arm of the sea, the submerged area becomes a portion of the bed and is insusceptible of private ownership. This is of necessity the law, because, to hold otherwise would be contrary to sound principles and public policy upon which the rule is predicated. It is the rule of property and of title in this State, and also a rule of public policy that the State, as a sovereignty, holds title to the beds of navigable bodies of water."
In the Miami Corporation case the court overruled the decision in State v. Erwin, 173 La. 507, 138 So. 84, 91. In the Erwin case this court was dealing with the title to a portion of the bed under the waters of Calcasieu Lake, and held it to be susceptible of private ownership. In overruling that holding the court in the Miami case quoted with approval from Comment, 7 Tulane Law Review 438, in which it was said that the Erwin case set a dangerous precedent contrary to the whole spirit of the Code which forbids private ownership of the beds of navigable waters, and that the case was entirely out of line with the existing Louisiana jurisprudence on the subject, and *20 that, since it was clearly bad policy to allow private ownership of the bed of navigable waters of any kind, it was submitted that the conclusion reached by the court in the Erwin case would produce undesirable results. However, even the Erwin case recognized that an arm or part of the sea is not susceptible of private ownership, for on rehearing in that case this court said that "* * * the rehearing was granted * * * in order to reconsider the question whether Calcasieu Lake is an arm or part of the sea". The court then said:
"If in fact it is [an arm or part of the sea], the lands involved are not susceptible of private ownership; they belong to nobody in particular; they fall into the class of public things, `the property of which is vested in a whole nation, and the use of which is allowed to all the members of the nation.' Civ.Code, arts. 450, 453."
Of course prior to 1921 there was no constitutional prohibition against the Legislature's disposing of the lands and property which the State held for the use of all of the people, but, as far as I can ascertain, to this day there has never been an act of the Legislature authorizing the sale or transfer of the bed of an arm of the sea or Gulf or expressing any change in this policy against such alienation. On the contrary, in line with the public policy of the State the Legislature on numerous occasions has passed statutes expressly prohibiting the alienation of an arm of the sea, and they demonstrate beyond any question the public policy of this State that the bed of an arm of the sea is not susceptible of private ownership. See Act No. 106 of 1886, Act No. 110 of 1892, Act No. 121 of 1896, Act No. 153 of 1902, Act No. 52 of 1904, Act No. 189 of 1910, Act No. 54 of 1914, Act No. 139 of 1924, and Act No. 67 of 1932.
For instance, both in the 1910 and in the 1914 acts it was provided in Section 1 that all beds and bottoms of bays, sounds, and inlets bordering on or connected with the Gulf of Mexico and that part of the Gulf of Mexico within the jurisdiction of the State of Louisiana shall be, continue, and remain the property of the State of Louisiana. These acts provided that no grant, sale, or conveyance of land forming the bottoms of said bodies of water "shall hereafter be made by the Register of the Land Office," and, further, in Section 2 of both acts it was provided "That the rights of the owners or occupants of land on the shores of any of the waters hereinabove described shall extend to the ordinary low water mark only, and no one shall own in fee simple any bottoms or lands enumerated in Section 1".
The provisions of these acts are mentioned and quoted hereinabove only for the purpose of showing what the public policy of this State has been with reference to private ownership of property of the kind with which we are here dealing.
In 1874, at the time the patent was issued to John Beckwith, it is beyond question that there was no statute or law of this State authorizing the State or any agency or officer thereof to transfer or otherwise alienate the bed to an arm of the sea, title to which was in the State by virtue of its sovereignty. The patent to John Beckwith when issued in 1874, insofar as it included the bed of Grand Bay, a navigable arm of the sea insusceptible of private ownership, was therefore null and void as it was issued in contravention of the established policy of the State, in contravention of the articles of the Civil Code, and in contravention of the existing jurisprudence interpreting these articles, which we have cited hereinabove.
The next question for consideration, then, is: Did Act No. 62 of 1912 have the effect of making valid the invalid patent that had been issued to Beckwith in 1874, or did this act ratify and confirm the invalid patent?
The patent describes the property conveyed according to governmental subdivisions, that is, by lots, sections, townships, and ranges, and it does not show on its face that a navigable arm of the sea, Grand Bay, was included in the property described therein.
Act No. 62 of 1912 provides that all suits or proceedings to vacate and annul any *21 patent issued by the State of Louisiana, duly signed by the Governor of the State and the Register of the State Land Office and of record in the State Land Office, or any transfer of any property by any subdivision of the State shall be brought within six years of the issuance of the patent, provided that suits to annul patents previously issued (of which this suit is one) shall be brought within six years from the passage of the act.
As I have heretofore pointed out, in 1912 when this statute was adopted private ownership of an arm of the sea was contrary to the articles of the Civil Code and the long established public policy of the State. Consequently this statute, which the Beckwith group claim had the effect of ratifying and confirming their void patent, is to be strictly construed against the grantee named in the patent; for, as was announced in the case of State v. Bayou Johnson Oyster Co., 130 La. 604, 58 So. 405, 410:
"It may be, and probably is, true that there is no legal inpediment in the way of the state's alienating such property [an arm of the sea] in favor of particular individuals or corporations, save in so far as such alienations might conflict with the power vested in Congress to regulate interstate and foreign commerce; but, as we have already seen, her declared policy has always been not to do so, and any statute or contract from which such effect were claimed would, necessarily, be strictly construed against the grantee."
To construe strictly against the grantee any statute from which alienation by the State of navigable waters is claimed is the legitimate and proper rule of construction which, contrary to the majority opinion, does no violence to Article 13 of the Civil Code. This rule is universally recognized and by its use even the common-law states have protected the beds of navigable bodies of water from claims of private ownership, even though those states may not have expressed in their statutory law recognition of the fundamental principles that appear in our Civil Code. In those states it is recognized that the state holds title to these navigable bodies of water in its sovereign, as distinguished from its proprietary, capacity in trust for the use of all the people. Pike Rapids Power Co. v. Minneapolis, St. P. & S. S. M. R. Co., 8 Cir., 99 F.2d 902; Holland v. Fort Pierce Financing & Const. Co., 157 Fla. 649, 27 So.2d 76; Miller v. Lewiston-Clarkston Canning Co., 35 Idaho 669, 209 P. 194; State v. New, 280 Ill. 393, 117 N.E. 597; Nelson v. De Long, 213 Minn. 425, 7 N.W. 2d 342; State v. Longyear Holding Co., 224 Minn. 451, 29 N.W.2d 657; Squaw Island Freight Terminal Co., Inc., v. City of Buffalo, 246 App.Div. 472, 284 N.Y.S. 598; State v. Cleveland & P. R. Co., 94 Ohio St. 61, 113 N.E. 677, 679, L.R.A.1917A, 1007; Hazen v. Perkins, 92 Vt. 414, 105 A. 249, 23 A.L.R. 748; Breese v. Wagner, 187 Wis. 109, 203 N.W. 764. This public trust prohibits the alienation of such title by the state except to the extent that the public interest may require, and that alienation cannot be made which is inconsistent with that public trust. New York, N. H. & H. R. Co. v. Armstrong, 92 Conn. 349, 102 A. 791; Caples v. Taliaferro, 144 Fla. 1, 197 So. 861; Holland v. Fort Pierce Financing & Const. Co., supra; State v. Longyear Holding Co., supra; Frazee Milling Co. v. State, 122 Misc. 545, 204 N.Y.S. 645; James River & Kanawha Power Co. v. Old Dominion Iron & Steel Corporation, 138 Va. 461, 122 S.E. 344. Any alienation or grant of the title to navigable waters by the legislature must be express and specific and is never implied or presumed from general language in a grant or statute. U. S. v. Groen, D.C., 72 F.Supp. 713; Smoot Sand & Gravel Corp. v. Columbia Granite & Dredging Corporation, 146 Md. 384, 126 A. 91; City of New York v. Brooklyn Borough Gas Co., 201 Misc. 672, 105 N.Y.S. 2d 459; State v. Bradford, 121 Tex. 515, 40 S.W.2d 1065; Diversion Lake Club v. Heath, Tex.Civ.App., 58 S.W.2d 566; Heard v. Town of Refugio, 129 Tex. 349, 103 S.W.2d 728; Lorino v. Crawford Packing Co., 142 Tex. 51, 175 S.W.2d 410; Grayburg Oil Co. v. Giles, 143 Tex. 497, 186 S.W.2d 680. The majority opinion does not cite a single authority to the effect *22 that it is a legitimate rule of statutory construction to interpret from general language of a legislature that it intended to change the public policy of the state and to part with title to the beds of navigable waters.
The 1912 act contains only a general repealing clause, and this repealing clause does not expressly alter or modify Articles 450, 451, 453, and 482 and other codal articles which declare an arm of the sea insusceptible of private ownership, nor is there any indication whatsoever that it was the purpose of the statute to change the existing public policy of the State that such an arm of the sea was not susceptible of private ownership.
To construe the statute as contended for by the Beckwith group, this act ratified and confirmed the patent to John Beckwith which was void when issued in 1874, and we should have to ignore and disregard the Code articles and the public policy of this State which had been in force for 100 years at the time the act was adopted.
This public policy that arms of the sea are not susceptible of private ownership, and the principles that the State owns them in its sovereign capacity and that all men have the right in common to use them are so fundamental that they would apply at all times and all places until the Legislature expresses an intention to change that policy and those principles. It is generally recognized that an interpretation of a statute is favored which is consistent with public policy, that derogation of common right and derogation of the State's sovereignty are never to be implied in a statute, and that repeals of laws by implication are never favored. 3 Sutherland, Statutory Construction (Horack's 3d ed.), sec. 5901, p. 125, sec. 6206, p. 180, sec. 6301, p. 183; Crawford, Statutory Construction, sec. 244, p. 477, sec. 246, p. 481.
The court here, instead of construing the statute strictly against the grantee, has violated all these rules of statutory construction and has construed the 1912 statute in a manner completely inconsistent with the public policy of this State and in complete disregard of it, has found by general language and by implication only that the State intended to divest itself of arms of the sea that it held in its sovereign capacity for all the people, and to divest the people of their common right to use that arm of the sea and to vest ownership in an individual. As the act of 1912 is applied here, the principle of insusceptibility of private ownership and the Code articles are nullified by the passage of six years from the issuance of a patent which included an arm of the sea. This interpretation has the same serious effect as a repeal of these articles of the Code by implication.
One principle of law which is well settled in our jurisprudence is that repeals by implication are not favored and will not be indulged if there is any other reasonable construction. In State v. Randall, 219 La. 578, 53 So.2d 689, 690, this rule was stated thus:
"Admittedly the statute does not expressly repeal the mentioned codal provisions; hence, the question is whether or not it repeals them by implication. In determining this question we must keep in mind those well established principles of law, reiterated in State v. Standard Oil Co. of Louisiana, 188 La. 978, 178 So. 601, 626, `* * * that "repeals by implication are not favored and will not be indulged if there is any other reasonable construction; * * *" * * * that prior laws are repealed by subsequent laws only in case of positive enactment or clear repugnancy * * *; that nothing short of irreconcilable conflict between two statutes works a repeal by implication * * *; * * *'". See also Chappuis v. Reggie, 222 La. 35, 62 So.2d 92; Wenk v. Anisman, 211 La. 641, 30 So.2d 567.
If the Legislature by the enactment of Act No. 62 of 1912 had intended to repudiate the articles of the Code and make such a serious change in the existing public policy of the State, it would have expressed that intention; and, as was said in Board of Com'rs of Tensas Basin Levee Dist. v. Hardtner, 164 La. 632, 114 So. 494, 500, "* * * it is not at all likely that the repeal *23 or revocation would have been left to implication instead of being made in unmistakable terms * * *".
As I have previously pointed out, the jurisprudence up to the passage of Act No. 62 of 1912 was uniform in holding that the bed or bottom of a navigable arm of the Gulf was insusceptible of private ownership (Milne v. Girodeau; Zeller v. Southern Yacht Club; Burns v. Crescent Gun & Rod Club; Louisiana Navigation Co. v. Oyster Commission, and State v. Bayou Johnson Oyster Co., all cited supra), and as further evidence of the public policy of the State various acts of the Legislature had expressly prohibited the alienation of such arm of the sea (Acts Nos. 106 of 1886, 110 of 1892, 121 of 1896, 153 of 1902, 52 of 1904, and 189 of 1910). If the 1912 act intended to nullify the articles of the Code and change the existing public policy, it is indeed strange and passing all understanding why in 1914 the Legislature unqualifiedly reaffirmed that public policy by saying in Act 54 that the beds and bottoms of bays bordering on or connected with the Gulf shall continue and remain the property of the State of Louisiana, and no one shall own in fee simple any such bottoms or lands. See also Act No. 139 of 1924, Act No. 67 of 1932.
It is my view that the Legislature by enacting the statute of 1912 never intended to limit at any time or prevent in any way, even by implication, the application of the articles of the Code or to change the strong public policy of this State to the effect that an arm of the sea is not susceptible of private ownership, and I am convinced that, had the Legislature intended to do so, it would have said so in unmistakable terms and not have left its intention to mere implication from general language only. Any valid construction of the act of 1912 does not and cannot have the effect of confirming and validating the patent and vesting in a private individual or individuals title to property which is not susceptible of private ownership under the express terms of our Civil Code and the public policy of the State. Any other interpretation of the statute, I am convinced, will lead to absurd consequences.
In my opinion the purpose and intent of the Legislature in enacting the statute was not to nullify the Code articles and to change the public policy and the existing jurisprudence, but to ratify and confirm any patent which had been theretofore issued which conveyed or purported to convey public lands susceptible of private ownership which it was ordinary or usual for the State to convey, and not a patent which conveyed a navigable arm of the sea such as Grand Bay.
In an effort to mitigate somewhat their unreasonable and unsound contention that the 1912 statute had the effect of making Grand Bay susceptible of private ownership, the Beckwith group concede that their ownership of the bed of Grand Bay is subject to public rights of commerce, navigation, and fisheries. If this bay is susceptible of private ownership, however, that ownership under Civil Code Article 505 "carries with it the ownership of all that is directly above and under it." The statute of 1912 contains no restriction on its effect of validating defects in patents warranting this concession. The patent itself contains no reservation, but is an outright grant and a conveyance of title from the State to John Beckwith.
This concession is completely revealing of the weakness of the Beckwiths' position, and they were compelled to make it because the fundamental soundness of the principle that arms of the sea are not susceptible of private ownership would not reasonably permit a contention to be maintained that the Legislature intended by implication to permit them to be privately owned. What other consideration could have compelled them to make such a concession? If the Beckwith group can own this property privately under a patent from the State, their ownership would not be burdened with a legal servitude in favor of the public. The servitudes imposed by law are found in Book II, Title IV, Chapter 3, of our Civil Code, and nowhere therein *24 in is such a servitude imposed upon navigable waters or an arm of the sea. No such servitude was imposed for the reason that the bed of an arm of the sea under the provisions of the Code is insusceptible of private ownership. The public has the right of use because ownership is in the State in its sovereign capacity, and giving such a right to the public by imposing a servitude on private ownership is inconceivable under this principle.
This concession of the Beckwith group appears to be an attempt to reduce the enormity of the act of reducing to private ownership a thing owned by the public as a whole by volunteering a kind of servitude in favor of the public. They would at this time permit the public all the uses to which the bay is subject except that of reducing the minerals under it to possession, thus retaining the exclusive right to lease for minerals. What is there in the law to prevent them from withdrawing a part or all of this concession? What if it should become profitable to them in the future to grant exclusive oyster or other fishing rights? What legal defense would the State have against such action if the 1912 statute cured all the defects of this patent and foreclosed any attack on it as a valid patent from the State? By this concession the Beckwith group would create for themselves a hybrid kind of ownershipprivate for the purpose of extracting the minerals, public for all other purposes, an ownership unknown both to the statutory law and the jurisprudence of this State and not founded in reason or logic.
Let us now consider the jurisprudence of this State in those cases which are relied on by the Beckwith group and which have held that Act No. 62 of 1912 had the effect of ratifying and confirming patents issued which were subject to annullment where the State failed to institute suit timely. These cases are: Atchafalaya Land Co. v. F. B. Williams Cypress Co., 146 La. 1047, 84 So. 351; State v. Sweet Lake Land & Oil Co., 164 La. 240, 113 So. 833; Realty Operators, Inc. v. State Mineral Board, 202 La. 398, 12 So.2d 198; O'Brien v. State Mineral Board, 209 La. 266, 24 So.2d 470; Humble Oil & Refining Co. v. State Mineral Board, 223 La. 47, 64 So.2d 839.
Before the holding in any of these cases is discussed, it should be pointed out that in not one of them was the court dealing with an arm of the sea such as Grand Bay, nor in any of these cases did the court consider or discuss the question of whether the property by its nature was insusceptible of private ownership, or that private ownership was expressly prohibited by the articles of the Code and the public policy of the State.
In the Atchafalaya Land Co. case, supra, the court held that Act No. 62 of 1912 made valid a patent issued to lands which were granted and included in the act creating the Atchafalaya Basin Levee District but which had never been transferred pursuant to the act to the district. That case under the facts presented therein was correctly decided, but in that case no arm of the sea or other navigable body of water was involved.
In State v. Sweet Lake Land & Oil Co., supra, the title to the bed of Sweet Lake was at issue. In that case the court found as a fact that the patents issued did not include lands within the tidewaters of the sea and that Sweet Lake was a shallow inland lake with no natural inlet or outlet and "* * * was never useful or available for navigation or commerce, or of any more importance to the public at any time in the memory of man than it is to-day". [164 La. 240, 113 So. 836.] In other words, the court found as a fact that Sweet Lake was not navigable in law or in fact, stating: "We agree with the district judge that there is no proof nor reason to believe that Sweet Lake was a navigable body of water in 1812, when Louisiana was admitted into the Union." However, in the course of that opinion it was said:
"* * * Conceding, for sake of argument, that the bed of Sweet Lake was not subject to sale under the provisions of section 11 of Act 75 of 1880, as sea marsh, subject to tidal overflow, at 12½ cents per acre, nevertheless the patents were signed *25 by the Governor and by the register of the state land office, and were recorded in the state land office, and purported to convey an area of land described so as to embrace the bed of the lake, and that is all that the act of the Legislature required in its declaration that such patents should be deemed valid and unassailable after 6 years. * * *"
The concession made by the court "for sake of argument" in that case was therefore nothing but dicta since the court had found that Sweet Lake was not presently navigable and not navigable in 1812. That statement was unnecessary for the opinion, had no application to the facts in the case, and therefore was not the law of the case and not binding or controlling in future cases. It was moreover a weak statement of dicta because it did not mention or analyze the articles of the Code, ran counter to the express public policy of this State and fundamental principles of the civil law, and was without foundation in reason or logic.
In Realty Operators, Inc., v. State Mineral Board, supra, the ownership of the bed of Lake Hatch was claimed under and by virtue of patents issued by the State. Lake Hatch was found to be a freshwater lake entirely surrounded by swamp or marshland, with no connection with any river or other natural outlet to the sea. Its navigability was an issue in the case, but in the course of the opinion this court concluded that the navigability of the lake was of no importance because, whether it was navigable or not, defendant's right to question the validity of the patents had been foreclosed by failure to file suit within six years from the passage of Act No. 62 of 1912. However, after concluding that the issue of navigability was of no importance, the court went on and assumed for the sake of argument that, if the lake was navigable in 1812 and the State was the owner of its bed by virtue of its sovereignty, there was no restriction, constitutional or otherwise, placed upon the State at the time the patent was issued which prevented it from disposing of the bed or bottom to private individuals. The author of that opinion evidently overlooked, since he did not discuss, the public policy restraining the State from disposing of such lands, and the Code articles recognizing the insusceptibility of private ownership of the beds of navigable lakes and operating as a restriction and prohibition against the State's disposing of such beds to private individuals. Moreover, in that opinion the court went on to say that, if there was any doubt respecting the validity of these patents insofar as they transferred title to the bed of this lake, the decision in the Sweet Lake case disposed of any right that the State had to question the legality of the title, quoting as authoriy therefor the dicta contained in the Sweet Lake case. In other words, in the Realty Operators case the court made the dicta in the Sweet Lake case the law applicable to that case.
The author of the majority opinion on rehearing in the instant case was the organ of the court in the case involving Lake Hatch (the Realty Operators case) which I am now discussing, and in the course of that opinion it was stated [202 La. 398, 12 So.2d 203]:
"The lake [Lake Hatch] is admittedly a freshwater lake not connected with any arm of the sea and, consequently, does not fall within the prohibition contained in Acts No. 106 of 1886, No. 153 of 1902 and No. 52 of 1904."
By this statement he concedes that, if Lake Hatch were an arm of the sea, it would fall within the prohibitions contained in the acts enumerated. The acts enumerated have already been mentioned and discussed by me hereinabove, and, by providing that the beds and bottoms of bays bordering on or connected with the Gulf shall continue and remain the property of the State and no one shall own in fee simple any bottoms to such lands, expressly prohibit the State from alienating such lands and dedicate them to public use.
The author of that opinion was evidently of the opinion that, had Lake Hatch been an arm of the sea such as is Grand Bay, Act No. 106 of 1886, Act No. 153 of 1902, *26 and Act No. 52 of 1904 would have prohibited its alienation, and the provisions of Act No. 62 of 1912 would not have been applicable, and there would have been no bar to the State's instituting suit to annul or vacate the patent.
In the case of O'Brien v. State Mineral Board, supra, the court found as a fact that the navigability of the lakes and watercourses, title to which was there involved, could not be definitely determined from the record, and that the State Mineral Board's attack on the patents was barred by the provisions of Act No. 62 of 1912, and, under the authority of the dicta accepted and announced as law in the Realty Operators case, the past and present navigability of these waters was not considered. In other words, the holding in that case was based entirely on the holding of the Realty Operators case, which in turn was based on the dicta contained in the Sweet Lake case.
There was not complete agreement among the members of the court as to the soundness and correctness of some of the pronouncements contained in the opinion in the O'Brien case, because only two members of the court signed the opinion as written, and Chief Justice O'Niell, Justice Fournet (now Chief Justice), Justice Ponder, Justice Hamiter, and the writer of this dissent concurred in the decree. Chief Justice O'Niell concurred but considered that the case of Miami Corporation v. State, 186 La. 784, 173 So. 315, had been wrongly decided, and that the decision in the Realty Operators case could not be reconciled with that decision. Justice Hamiter, the organ of the court in the present case on original hearing, concurred for the reason that the State Mineral Board had failed to discharge its burden of proving the navigability in 1812 of the watercourses involved. By thus concurring in the decree Justice Hamiter evidently was then of the opinion that, had the State Mineral Board proved that the watercourses were navigable in 1812, the provisions of Act No. 62 of 1912 would not have been applicable.
The last case to be considered and the one on which the opinion on first hearing principally relied is Humble Oil & Refining Co. v. State Mineral Board, supra, commonly called the "Duck Lake case". In that case the title to the bottom of Duck Lake was involved, as it was included in the description in a patent issued by the State. It was conceded that Duck Lake was presently navigable and was navigable in 1812 when Louisiana was admitted into the Union. The State Mineral Board contended that the bed of this lake was sovereignty land which was not covered by, and could not have been embraced within, the Swamp Land Grant, and title could not be transferred to private individuals. In disposing of this contention the court very briefly concluded that, the transfer to private individuals being an accomplished fact, the State was accorded six years to contest the matter, and that failure to institute suit within that time constituted a ratification of the action of its officers in disposing of the property, citing in support thereof Atchafalaya Land Co. v. F. B. Williams Cypress Co., supra.
As I have heretofore pointed out, in the Atchafalaya Land Co. case no navigable arm of the Gulf or other navigable body of water was involved, and the statement which the author of the opinion in the Duck Lake case quotes in a footnote as authority for the holding in that case is, again, nothing but mere dicta, and in any event could have had no application to a case in which a navigable body of water was involved.
Let me now summarize the questions of fact with reference to the navigability of the waters in the cases above discussed.
In the Atchafalaya Land Co. case no navigable arm of the sea or other navigable body of water was involved, and that case could have no application to a case involving navigable waters. In the Sweet Lake case the court found as a fact that Sweet Lake was not presently navigable or navigable in 1812. Consequently, anything said in that case with reference to *27 the applicability of Act No. 62 of 1912 to an action of the State to annul a patent to navigable waters was nothing but obiter dicta.
In the Realty Operators case the court said that the issue of navigability was of no importance, and that it was immaterial whether Lake Hatch was navigable or not. In the O'Brien case the navigability of the waters and watercourses could not be definitely determined. In those two cases, however, the court held that the State's right to question the validity of the patents was barred by the provisions of Act No. 62 of 1912.
In the Duck Lake case it was conceded that Duck Lake was navigable presently and in 1812, and this is the only case in which the court found the lake or body of water involved to be navigable, and it is upon this decision that the majority of the court primarily relies.
The final judgments or decrees rendered by the court in the Atchafalaya Land Co. case and the Sweet Lake case were correct, and with them I am in full accord. The pronouncements or statements in the Realty Operators case to the effect that the navigability of Lake Hatch was of no importance and immaterial and that the action to annul the patent was barred by Act No. 62 of 1912 were incorrect. The court was in error in applying the provisions of Act No. 62 of 1912 without ascertaining the navigability of the waters and watercourses in the O'Brien case. The pronouncements and statements in the Realty Operators and O'Brien cases were erroneous and should be corrected. The Duck Lake case should be overruled because it is erroneous in the following particulars:
(1) In holding that patents to navigable waters are not subject to attack if not timely made under the provisions of Act No. 62 of 1912, thereby permitting these navigable waters to be privately owned in direct violation of, and contrary to, the express provisions of the articles of the Civil Code;
(2) In not strictly construing Act No. 62 of 1912 against this grantee in accord with State v. Bayou Johnson Oyster Co., supra, thus holding, in effect, that this act has, not expressly, but merely by implication, nullified the articles of the Code;
(3) In contravening the public policy of this State since its existence as a State that navigable waters, title of which was in the State in its sovereign capacity, are insusceptible of private ownership;
(4) In disregarding and not following and, in effect, overruling a long line of jurisprudence in which it had been consistently held that the beds of arms of the sea or navigable waters of this State are insusceptible of private ownership. Milne v. Girodeau; Zeller v. Southern Yacht Club; Louisiana Navigation Co. v. Oyster Commission; State v. Bayou Johnson Oyster Co.; Miami Corporation v. State; Burns v. Crescent Rod & Gun Club; all cited supra;
(5) In disregarding the cardinal rules of statutory construction that statutes are to be construed consistently with public policy and against derogation of sovereignty and common right, and that repeals by implication are not favored and will not be indulged if there is any other reasonable construction (a reasonable construction in the instant case is that the words "transfer of property" and "patent" as used in the 1912 act were intended to apply only to transfer or patent to things susceptible of private ownership);
(6) In basing the holding and decision on the pronouncements or obiter dicta expressed in the Atchafalaya Land Co. case which had no application to a navigable body of water, and on the dicta which were contrary to the Code, the jurisprudence, and the public policy of the State.
One of the leading cases in our jurisprudence on the question of whether the beds of navigable waters are susceptible of private ownership is Miami Corporation v. State, 186 La. 784, 173 So. 315, 327. In that case the issue of title to a portion of Grand Lake, a navigable body of water, was before the court for determination. After a lengthy discussion this court said:
"* * * We are further of the opinion that the bed or bottom of Grand Lake, a *28 navigable body of water, including the area in controversy, which has been submerged since 1883, belongs to the State of Louisiana, by virtue of its sovereignty, it being a public thing and insusceptible of private ownership under the provisions of Articles 450 and 453 of the Revised Civil Code."
In the course of that opinion the court said that a navigable body of water, regardless of whether it was a body of fresh water or the sea or an arm of the sea, is insusceptible of private ownership, and that this is of necessity the law because to hold otherwise "would be contrary to sound principles and public policy upon which the rule is predicated. It is the rule of property and of title in this State, and also a rule of public policy that the State, as a sovereignty, holds title to the beds of navigable bodies of water".
That case became final in 1937, and Act No. 62 of 1912, although then in full force and effect, was not mentioned or discussed. However, that fact does not detract in any way from the authority of the case as pronouncing the rule of property and of title in this State and of public policy, that the State as a sovereign holds title at all times to the beds of navigable arms of the Gulf and other navigable waters, and that they are insusceptible of private ownership.
The holding in that case was not overruled, nor was it mentioned, in any of the cases discussed above except that in the O'Brien case an effort was made to distinguish it from the Sweet Lake and Realty Operators cases and the O'Brien case. The distinction which was made was that in the Miami Corporation case Grand Lake was a large and important commercial waterway, whereas in the other cases the patents were to unimportant lakes and the beds of streams. To me, this is not a valid distinction, and the late Chief Justice O'Niell refused to accept this distinction as shown by his reasons given for concurring in the decree in the O'Brien case. However, it is significant that even in the O'Brien case the court said [209 La. 266, 24 So.2d 473]:
"The Miami case is consistent with the sound public policy on navigable waters as followed in the Constitution of 1921, which specifically forbids the agencies of the State of Louisiana from conveying any future title to the bottoms of navigable waters."
If the bed of a navigable arm of the sea and the beds of other navigable waters are susceptible of private ownership, as the majority of the court holds them to be, then the instant case overrules the decision in the Miami case which recognized as a rule of property and title of this State and also a rule of public policy that the State of Louisiana as a sovereign holds title at all times to the navigable arms of the Gulf and other navigable waters, and that they are insusceptible of private ownership. Moreover, in the instant case the majority of the court, by permitting an arm of the sea to be privately owned, is reinstating the holding in the Erwin case, supra, that water bottoms or beds of this kind are susceptible of private ownership, which was repudiated, shown to be incorrect, and expressly overruled in the Miami case.
In State v. Erwin, supra, this court recognized private ownership of the beds of navigable lakes or held that they were susceptible of private ownership. That case was expressly overruled in Miami Corporation v. State, supra, even though the ruling in State v. Erwin may have established a rule of property, and in overruling the Erwin case this court said in the Miami case:
"Even in regard to the rules of property, the maxim of stare decisis is not absolutely inflexible. This is particularly true when it is shown that by following, rather than by disregarding previous erroneous decisions from which an evil resulted, the community would suffer greater damage. In such situation, the courts have overruled the prior cases, in order to correct the jurisprudence. In Louisiana, this court has never hesitated to overrule a line of decisions where they establish a rule of property where greater harm would result from perpetuating the error rather than from correcting."
This statement from the Miami case is appropriate here. Decisions which establish a rule of property, in my opinion should not be lightly regarded or overruled except *29 for the most compelling reasons, as stated by me in my dissent in the case of Lee v. Jones, 224 La. 231, 69 So.2d 26, 33; but I am convinced that the decision rendered in the Duck Lake case and the erroneous statements made in the Realty Operators case and the O'Brien case should be corrected and not perpetuated in the jurisprudence, and that a greater harm would result from perpetuating the error than from correcting it.
The decision rendered by the majority of the court in the instant case is one of farreaching effect, and it takes no seer or prophet to foretell that as a result of this decision private individuals will successfully claim title under old patents to the beds of numerous bays on the Gulf, large lakes, etc., from which oil is being or will be produced, and the holding that such properties are susceptible of private ownership will deprive the people of this State of tremendous sums of money, running into millions, which, I say with due respect to the views of the majority, legally belong to them. For the reasons I have given, I therefore cannot and do not subscribe to the majority opinion.
NOTES
[1] This doctrine does not apply against the State with respect to accretion or subsidence of a navigable body of water. See State v. Jefferson Island Salt Mining Co., 183 La. 304, 163 So. 145.
[2] In State ex rel. Saint v. Timothy, 166 La. 738, 117 So. 812, 813, the court specifically rejected the contention that the bed of Lake Ponchartrain was a common thing as defined by Article 450 of the Civil Code. It said: "It will be noted that the illustrations given in the article, viz.: the air, running water, the sea and its shores, do not, even impliedly, include the beds of any waters".
[3] But see Milne v. Girodeau, 1838, 12 La. 324, which characterized the bed of Lake Ponchartrain as not being susceptible of private ownership under Articles 440, 441, 442, 443 and 444 of the Code of 1825.
[4] It is significant that this article, in describing the kind of public things, enumerates "navigable rivers, seaports, roadsteads and harbors, highways and the beds of rivers, as long as the same are covered with water". Nothing is said therein with respect to navigable lakes, bays, or the beds thereof.
[5] Counsel for the State contend that the ruling in the Sweet Lake case, applying Act No. 62 of 1912 to navigable water bottoms, was obiter dicta. Perhaps this is true but it is certain that the Attorney General was aware of the ruling and it is to be assumed that the Legislature became acquainted with it. Yet, nothing was done by that body to amend the statute in order to obviate future rulings like that in this case, of which complaint is now belatedly made.
[1] The only decision divergent from this well established public policy is Humble Oil & Refining Co. v. State Mineral Board, 223 La. 47, 64 So.2d 839, which was written as recently as January of 1953 by the author of the majority opinion on rehearing here, and is commonly referred to as the "Duck Lake Case." But in that case there is no reference, much less consideration given, to the basic law of the state as sustained by our unbroken line of jurisprudence.
[1] The 1921 Constitution is the first which contains the prohibition against the alienation of the fee of the bed of any body of navigable water (except for purposes of reclamation). Art. 4, sec. 2, La.Const. of 1921. The inclusion in the Constitution of this prohibition against the Legislature's changing in any way the public policy of this State against alienating the beds of navigable bodies of water demonstrates the importance of this policy to the people and to the State.